Tommy SHAW

v.

**LIBRARY OF CONGRESS, et al., Appellants.**

No. 82–1019.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 9, 1982.

Decided Nov. 6, 1984.

As Amended Nov. 13, 1984.

Ginsburg, Circuit Judge, filed dissenting opinion.

John Oliver Birch, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, and Royce C. Lamberth, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellants. Kenneth M. Raisler, Asst. U.S. Atty., Washington, D.C., also entered an appearance for appellants.

Charles Stephen Ralston, New York City, with whom Shalon Ralph, Chevy Chase, Md., was on the brief, for appellee.

Before ROBINSON, Chief Judge, WALD and GINSBURG, Circuit Judges.

Opinion for the Court filed by Chief Judge SPOTTSWOOD W. ROBINSON, III.

Dissenting Opinion filed by Circuit Judge GINSBURG.

**SPOTTSWOOD W. ROBINSON, III,** Chief Judge:

A corollary to the doctrine of sovereign immunity exempts the United States from liability for interest absent its express consent thereto.[1] The sole issue on this appeal is whether the District Court dishonored that precept when, in assessing an attorneys' fee against the United States, it effected a 30 percent upward adjustment of the lodestar[2] to compensate the attorney for delay in receipt of payment.

We sustain the adjustment alternatively on two grounds. First, we conclude that the language of the statute authorizing allowances of attorneys' fees against the United States in employment-discrimination cases waives its sovereign immunity with respect to the delay component of the fee award. Second, we find that component validated by a line of cases relaxing the traditional rigor of the sovereign-immunity doctrine.

I

In 1976 and again in 1977, Tommy Shaw, a black employee of the Library of Congress, submitted complaints of job-related racial discrimination to the Library's Equal Employment Office.[3] In 1978, after the Library remained resistant to these complaints, Shaw's counsel engaged in administrative proceedings and during the course thereof entered into negotiations which culminated in a settlement agreement.[4] As part of the settlement, the Library agreed to promote Shaw retroactively with backpay provided the Comptroller General first determined that the Library had authority to do so without a specific finding of racial discrimination.[5] The Comptroller General, however, held that the Library lacked pow-

1. See Part IV *infra.*

2. The lodestar component of an attorneys' fee is the product of "the number of hours reasonably expended multiplied by a reasonable hourly rate." *Copeland v. Marshall,* 205 U.S.App.D.C. 390, 401, 641 F.2d 880, 891 (*en banc* 1980).

3. See Complaint ¶ 12, *Shaw v. Library of Congress,* Civ. No. 79–0325 (D.D.C.) (filed Feb. 1,

1979), Record Document (R. Doc.) 1 [hereinafter cited as Complaint].

4. Settlement Agreement and General Release (filed Feb. 1, 1979), Exhibit 1 to Complaint, *supra* note 3, R. Doc. 1 [hereinafter cited as Settlement Agreement].

5. *Id.* at pp. 4–5, R. Doc. 1.

er under the Back Pay Act of 1966[6] to pursue that course.[7]

Dissatisfied with this turn of events, Shaw sued in the District Court[8] and ultimately prevailed on his position that the Library had authority to afford the relief specified in the settlement accord.[9] As a result of Shaw's victory, the court ordered that he be awarded litigation costs and reasonable attorneys' fees,[10] withholding, however, determination of the dollar amount thereof until after further proceedings and this court's decision in *Copeland v. Marshall,*[11] then pending *en banc.*[12] By this time, primary responsibility for prosecution of Shaw's claim had devolved upon new lawyers, but the efforts of his earlier counsel before the Library and in the District Court had involved considerable time and energy.[13] After our decision in *Copeland* was announced, counsel moved for an allowance of attorneys' fees,[14] requesting compensation at the rate of $85 per hour

for 103.75 hours of work on Shaw's behalf during the course of those proceedings.[15]

Largely dismissing the Library's challenges to both the hourly rate and the number of hours claimed by Shaw's counsel,[16] the District Court computed a lodestar of $8,435,[17] based on 99 hours of work at the $85 proposed hourly rate, excluding from its calculation 4.75 hours which counsel devoted to research in an abortive effort to impart a class-action aspect to Shaw's administrative complaints.[18] The court then reduced the lodestar by 20 percent to reflect the quality of counsel's representation.[19] Lastly, and most importantly for this appeal, the court increased the lodestar by 30 percent to compensate counsel for the delay in actual payment for the legal services he had rendered.[20] The court explained:

> This case should have ended in August 1978, or at the latest in November of that year. If [Shaw's counsel] had been com-

---

**6.** Act of Mar. 30, 1966, Pub.L. No. 90–380, 80 Stat. 94 (codified as amended at 5 U.S.C. §§ 5595–5596 (1982)).

**7.** Letter from Paul G. Dembling to Donald C. Curran (Nov. 2, 1978), Exhibit 2 to Complaint, *supra* note 3, R. Doc. 1. The Comptroller General declined to consider whether the Civil Rights Act of 1964, Pub.L. No. 88–352, tit. VII, § 717(b), 78 Stat. 241, as amended by the Equal Employment Opportunity Act of 1972, Pub.L. No. 92–261, § 11, 86 Stat. 111 (codified as amended at 42 U.S.C. § 2000e–16(b) (1982)), authorized retroactive promotion and backpay in Shaw's instance, presumably because the Library inquired only as to its authority under the Back Pay Act.

**8.** *Shaw v. Library of Congress,* 479 F.Supp. 945 (D.D.C.1979).

**9.** *Shaw v. Library of Congress,* 479 F.Supp. 945, 947–949 (D.D.C.1979).

**10.** *Id.* at 950.

**11.** *Supra* note 2.

**12.** *Shaw v. Library of Congress, supra* note 9, 479 F.Supp. at 950.

**13.** Shalon Ralph, the fee claimant in this litigation, succeeded another attorney as Shaw's counsel in early 1978, while the case was in its administrative phase. Additional counsel for Shaw entered the picture shortly thereafter, and their claims for attorneys' fees have been set-

tled. Ralph participated in the administrative proceedings and negotiations, and assisted the other counsel in preparation of a brief to the Comptroller General and in their representation of Shaw in the District Court. Hereinafter when we speak of Shaw's counsel, we refer to Ralph.

**14.** Plaintiff's Motion for Award of Attorney's Fees and Costs, *Shaw v. Library of Congress,* Civ. No. 79–0325 (D.D.C.) (filed May 11, 1981), R. Doc. 37.

**15.** *Id.* § II(2), R. Doc. 37.

**16.** See Defendant's Memorandum of Points and Authorities in Opposition to Motion for Attorney's Fees, *Shaw v. Library of Congress,* Civ. No. 79–0325 (D.D.C.) (filed June 11, 1981), R. Doc. 41.

**17.** The District Court made a mathematical mistake when it calculated the lodestar at $8,435; 99 hours of work at $85 per hour comes to $8,415, not $8,435. We accordingly treat the lodestar as lowered to $8,415.

**18.** *Shaw v. Library of Congress,* Civ. No. 79–0325 (D.D.C. Nov. 4, 1981) (memorandum) at 6–8, R. Doc. 45.

**19.** *Id.* at 8–9, R. Doc. 45.

**20.** *Id.* at 9–10, R. 45.

pensated at about that time, he could have invested the money at an average yield of not less than 10% per year. It is the fault of neither [Shaw] nor [counsel] that payment was not made sooner. It is reasonable to assume that if payment is made promptly, counsel will receive his reimbursement by December 1, 1981. Accordingly, the accompanying order reflects an upward adjustment of 30% for delay.[21]

Then, offsetting the 30 percent increase in the lodestar by the 20 percent reduction in the lodestar, the District Court granted a net 10 percent addition to the lodestar[22] and, accordingly, awarded counsel a fee of $9,278.50.[23] The Library has appealed,[24] arguing that the 30 percent upward adjustment for delay infringes the rule that interest may not be assessed against the United States in the absence of waiver.[25]

## II

■ The issue posed on appeal is hardly one of first impression. In *Copeland v.* *Marshall*,[26] we declared *en banc* that the United States can be held liable under Title VII of the Civil Rights Act of 1964[27] for attorneys' fees in an amount augmented to compensate for the lag attending payment. We said:

> The delay in receipt of payment for services rendered is an additional factor that may be incorporated into a contingency adjustment. The hourly rates used in the "lodestar" represent the prevailing rate for clients who typically pay their bills promptly. Court-awarded fees normally are received long after the legal services are rendered. That delay can present cash-flow problems for the attorneys. In any event, payment today for services rendered long in the past deprives the eventual recipient of the value of the use of the money in the meantime, which use, particularly in an inflationary era, is valuable. A percentage adjustment to reflect the delay in receipt of payment therefore may be appropriate.[28]

21. *Id.,* R. Doc. 45 (footnote omitted). The court further justified the adjustment on the ground that the Library might earlier have tendered partial payment to counsel despite the outstanding appeal in *Copeland v. Marshall. Id.* at 9 n. 4, R. Doc. 45.

22. *Id.* at 10, R. Doc. 45. Our dissenting colleague implies that the District Court unfairly penalized counsel by utilizing simple rather than compound interest, and committed arithmetic error when it increased the lodestar by 30% and then reduced that figure by 20% of the lodestar, rather than by 20% of the upwardly adjusted figure. See Dissenting Opinion (Dis. Op.) at 16 n. 13. Judges have broad latitude in setting attorneys' fees, *Copeland v. Marshall, supra* note 2, 205 U.S.App.D.C. at 411, 641 F.2d at 901; *Cuneo v. Rumsfeld,* 180 U.S.App.D.C. 184, 192, 553 F.2d 1360, 1368 (1977), and in neither of these respects can we say that the District Court abused its discretion.

23. *Shaw v. Library of Congress, supra* note 18, at 10, R. Doc. 45. The court also awarded Shaw $47.50 in costs, *id.,* which the Library does not challenge on appeal.

24. After oral argument on appeal, we ordered the Library to pay to counsel $6,779.50, the portion of the award not in dispute. *Shaw v. Library of Congress,* 701 F.2d 222 (D.C.Cir.1983) (partial judgment).

25. Brief for Appellant at 5–8.

26. *Supra* note 2.

27. Pub.L. No. 88–352, tit. VII, § 706(k), 78 Stat. 261 (1964) (codified as amended at 42 U.S.C. §§ 2000e–5(k) (1982)) [hereinafter cited as codified].

28. *Copeland v. Marshall, supra* note 2, 205 U.S. App.D.C. at 403, 641 F.2d at 893 (footnotes and citation omitted). We also endorsed calculation of the lodestar on presently-prevailing hourly rates as an alternative method of compensating attorneys for delay. *Id.* at 403 n. 23, 641 F.2d at 893 n. 23.

We may note here that, regardless of whether the defendant is the United States or a private party, a delay-in-payment adjustment would be appropriate only where the lodestar is the per-hour charge to clients who pay when billed. *Murray v. Weinberger,* 741 F.2d 1423 at 1432 (D.C.Cir. Aug. 24, 1984). If the lodestar represents a higher rate charged clients who sue under fee-shifting statutes, it has already taken into account the pecuniary disadvantage resulting from the lengthy wait for payment ordinarily encountered under such statutes. In such an instance, an upward adjustment for delay would, of course, result in the attorney being paid twice for the delay. It appears that the cases relied on by the District Court in setting

We have subsequently reaffirmed this principle [29] and, indeed, have upheld an award of attorneys' fees against the United States that in fact was adjusted upward to compensate for delay.[30]

Despite the seemingly clear applicability of these precedents, however, we do not rest our disposition on stare decisis alone. Whether an upward delay adjustment in an attorneys'-fee award satisfies the rigorous requirements of the sovereign-immunity doctrine is an issue we have dealt with only peripherally,[31] and one we have never squarely addressed. We recognize, too, the jurisdictional implications of any legal bar created by that doctrine, and acknowledge the existence of decisions of this circuit arguably in conflict with *Copeland* and its progeny on this point.[32] We therefore opt to consider the Library's argument much as if it were presented upon a clean slate.

the $85 per-hour lodestar for counsel here did not in any way include a delay element in their own per-hour rate calculations. *North Slope Borough v. Andrus*, 515 F.Supp. 961 (D.D.C. 1981), *rev'd on other grounds sub. nom Katkovik v. Watt*, 223 U.S.App.D.C. 39, 689 F.2d 222 (1982); *Bachman v. Pertschuk*, 19 Empl.Prac. Dec. (CCH) ¶ 9044, at 6507 (D.D.C.1979). See *Shaw v. Library of Congress, supra* note 18, at 7, R. Doc. 45. Our disposition of this appeal, however, will include a remand in order that the District Court may make certain that counsel is not being awarded double compensation for the delay.

**29.** *Jordan v. United States Dep't of Justice*, 223 U.S.App.D.C. 325, 329, 691 F.2d 514, 518 (1982) (involving claim for attorneys' fees against United States under provision of Freedom of Information Act (citing *Copeland v. Marshall, supra* note 2, 205 U.S.App.D.C. at 402–403, 641 F.2d at 892–893, for proposition that attorneys' fee award may reflect delay in payment)); *National Ass'n of Concerned Veterans v. Secretary of Defense*, 219 U.S.App.D.C. 94, 103, 110, 675 F.2d 1319, 1328, 1335 (1982) (affirming propriety of adjusting attorneys'-fee award against United States to compensate for delay in two Freedom of Information Act cases and one Title VII case).

**30.** *EDF v. EPA*, 217 U.S.App.D.C. 189, 206, 672 F.2d 42, 59 (1982). Cf. *Murray v. Weinberger, supra* note 28, at 1432–1434 (allowing a properly-justified adjustment to lodestar for delay in payment in a Title VII attorneys' fee claim).

III

The initial inquiry, of course, is whether the District Court's 30 percent augmentation of the lodestar for delay in payment of the fee constitutes "interest" against the United States within the contemplation of the rule invoked by the Library. Shaw characterizes this component of the fee award as a proper ingredient of a reasonable attorneys' fee, in contradistinction to interest.[33] The only way to determine whether this addition to the lodestar is condemned by the traditional interest rule is to ascertain what that rule prohibits.

Perhaps the clearest example of interest appears when a court, after calculating the amount of a monetary judgment, adds a percentage of that amount to compensate the claimant for loss of use of the money during the period between the claimant's initial entitlement to the money and the day the judgment is rendered.[34] Here the long-

**31.** See *Copeland v. Marshall, supra* note 2, 205 U.S.App.D.C. at 404–405 & n. 25, 641 F.2d at 894–895 & n. 25 (holding that liability for attorneys' fees under Title VII is the same for the United States as for any private party); *Holly v. Chasen*, 205 U.S.App.D.C. 273, 276, 639 F.2d 795, 798, *cert. denied*, 454 U.S. 822, 102 S.Ct. 107, 70 L.Ed.2d 94 (1981) (overturning, on grounds of sovereign immunity, award of interest on judgment against United States in a Freedom of Information Act case, but expressly reserving question whether upward adjustment in an attorneys' fee award to compensate for delay would likewise be invalid).

**32.** See *Holly v. Chasen, supra* note 31; *Blake v. Califano*, 200 U.S.App.D.C. 27, 626 F.2d 891 (1980). The dissent's use of broad language in *Segar v. Smith*, 238 U.S.App.D.C. 103, 150, 738 F.2d 1249, 1296 (1984), may give the impression that the attorneys'-fee provision at issue here, 42 U.S.C. § 2000e–5(k) (1982), was involved in *Segar*. Dis. Op. at 5. *Segar* concerned only an award of interest under the backpay section of Title VII, 42 U.S.C. § 2000e–5(g); the dispute did not extend to interest under the attorneys'-fee provision, 42 U.S.C. § 2000e–5(k) (1982), which uses language wholly different from that employed in the backpay section.

**33.** Brief for Appellant at 10.

**34.** E.g., *United States v. Thayer-West Point Hotel Co.*, 329 U.S. 585, 587–588, 67 S.Ct. 398, 399, 91 L.Ed. 521, 525 (1947).

established rule refuses to view the sovereign as having consented to the addition, even though consent to suit on the claim has been established.[35] The same results follow court-awarded sums which, though not interest calculated in the classic manner, nonetheless are functionally equivalent to interest. Thus the Supreme Court has rejected a contention that an increase in an assessment by the Court of Claims against the United States, made as compensation for loss of use and occupation of a mining claim appropriated by the United States years earlier, was "compensation" rather than interest.[36] The Court reasoned that because "the loss of the use of the money results from the failure to collect sooner a claim held to have accrued when the company's property was taken, that which the company seeks to recover is, in substance, interest."[37] We ourselves recently held an "inflation adjustment" in awards of back-pay to federal employees amounted to interest against the United States because it

served "the same general end of compensating the recipient for differences in the worth of her award between the date of actual receipt and the date as of which the money should have been paid."[38]

■ In the case at bar, the District Court's 30 percent addition to the lodestar was designed to reimburse Shaw's counsel for the decrease in value of his uncollected legal fee between the date on which he concluded his legal services and the court's estimated date of likely actual receipt.[39] By the court's own description, the addition was based on a rough determination of the "average yield" of the amount of the fee if invested at 10 percent per annum for three years.[40] We think the adjustment falls well within the contours of the interest concept. Only by ignoring applicable case-law as well as as the real nature of the disputed adjustment could we find anything other than an assessment of interest against the United States.[41] We proceed,

**35.** E.g., *United States v. Alcea Band of Tilla-mooks,* 341 U.S. 48, 71 S.Ct. 552, 95 L.Ed. 738 (1951); *United States v. Goltra,* 312 U.S. 203, 61 S.Ct. 487, 85 L.Ed. 776 (1941).

**36.** *United States v. North Am. Transp. & Trading Co.,* 253 U.S. 330, 40 S.Ct. 518, 64 L.Ed. 935 (1920).

**37.** *Id.* at 338, 40 S.Ct. at 521, 64 L.Ed. at 939.

**38.** *Blake v. Califano, supra* note 32, 200 U.S.App. D.C. at 31, 626 F.2d at 895. Accord, *Saunders v. Claytor,* 629 F.2d 596, 598 (9th Cir.1980), *cert. denied,* 450 U.S. 980, 101 S.Ct. 1515, 67 L.Ed.2d 815 (1981) ("[i]n essence, the inflation factor adjustment is a disguised interest award").

**39.** See text *supra* at note 21.

**40.** *Shaw v. Library of Congress, supra* note 18, at 9–10, R. Doc. 45.

**41.** See *United States v. Mescalero Apache Tribe,* 518 F.2d 1309, 1322 (Ct.Cl.1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976) ("the character or nature of 'interest' cannot be changed by calling it 'damages,' 'loss,' 'earned increment,' 'just compensation,' 'discount,' 'offset,' or 'penalty,' or any other term, because it is still interest and the no-interest rule applies to it") (footnote omitted).

The dissent suggests that an upward adjustment of an attorneys' fee to compensate for delayed receipt can be differentiated from interest on the ground that the former applies "pro-

spectively" while interest is awarded "retrospectively." Dis. Op. at 1, 4–5. This distinction apparently takes on dispositive significance. We note that any prospectivity here is fictional, for an award under a fee-shifting statute benefiting only a party prevailing in litigation can never be made prospectively. More importantly, we cannot see why the moment in time at or as of which compensation for delayed receipt of payment is calculated should matter; for us, it is the *reason* why the fee is adjusted upward that is vital. Addition of a delay factor to the lodestar serves only to compensate the attorney for loss of the use of earned money from the time of rendition of services to the time of receipt of the fee. See text *supra* at note 28, quoting *Copeland v. Marshall, supra* note 2, 205 U.S.App.D.C. at 403, 641 F.2d at 893. The dissent itself, in distinguishing the delay factor from interest, characterizes the delay factor thus: "an attorney embarking on services for which he or she anticipates payment ultimately, but not promptly, may factor in the expected delay." Dis. Op. at 1. By this we can only assume that our colleague means that the increase is to compensate for a supposed possibility of delayed payment, and consequently for deprivation of the use of the fee money during the period of delay. We are unable to distinguish between that and compensation for the use, forbearance or detention of money—the common understanding of interest. If the delay factor sounds like interest, acts like interest and, most of all, compensates exactly as interest

then, to the Library's contention that the District Court's action in this regard disregards the dictates of the doctrine of sovereign immunity.

## IV

■ The United States cannot be subjected to monetary liability save pursuant to a waiver of its sovereign immunity.[42] Moreover, the scope of such a waiver is to be strictly construed.[43] The instant case involves a corollary of these principles, which for convenience we term the "interest rule." By this rule, the United States may not be held liable for interest absent an express waiver of its immunity.[44] The question we face here is whether Congress has waived that immunity with respect to an allowance of interest as part of an attorneys' fee awarded, as here, under Title VII.

■ The relevant section of Title VII provides that

[i]n any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the [Equal Employment Opportunity] Commission or the United States, a

reasonable attorney's fee as part of the costs, and the Commission and *the United States shall be liable for costs the same as a private person.*[45]

A private person, of course, may be held liable for interest as an ingredient of a Title VII attorneys'-fees award,[46] and this section subjects the United States to liability for "costs the same as a private person," and authorizes assessment of "a reasonable attorney's fee as part of the costs." We conclude that Congress thus has waived the immunity of the United States from liability for interest as a component of an attorneys' fee allowed under Title VII.

The statutory waiver is express, and its range is defined in unmistakable language. To say that a private person, but not the United States, is liable under Title VII for interest as an element of an attorneys' fee would rob the unambiguous statutory language of its plain meaning. It would defeat the statutory imposition upon the United States of a liability for costs, and the statutory inclusion of "a reasonable attorney's fee as part of the costs," identical to

---

would, we feel constrained to treat it as interest for purposes of the sovereign-immunity rule.

**42.** E.g., *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058, 1061 (1941); *United States v. Lee,* 106 U.S. (16 Otto) 196, 1 S.Ct. 240, 27 L.Ed. 171 (1882); *United States v. McLemore,* 45 U.S. (4 How.) 286, 11 L.Ed. 977 (1846).

**43.** E.g., *United States v. Sherwood, supra* note 42, 312 U.S. at 590, 61 S.Ct. at 771, 85 L.Ed. at 1063.

**44.** E.g., *United States v. Louisiana,* 446 U.S. 253, 264–265, 100 S.Ct. 1618, 1626, 64 L.Ed.2d 196, 208 (1980). Courts have not been entirely consistent in applying this rule, however. Compare *Henkels v. Sutherland,* 271 U.S. 298, 46 S.Ct. 524, 70 L.Ed. 953 (1926) (allowing interest as component of assessment against United States for confiscation of securities, in part to prevent unjust enrichment), with *Angarica v. Bayard,* 127 U.S. 251, 8 S.Ct. 1156, 32 L.Ed. 159 (1888) (disallowing interest as an item in assessment against United States for money withheld from awardee). Courts also have established an exception to the rule in inverse eminent domain cases, in which interest has been allowed as an element of the constitutional measure of just

compensation. See *Blake v. Califano, supra* note 27, 200 U.S.App.D.C. at 29 n. 5, 626 F.2d at 893 n. 5, and cases cited therein. For a discussion of two other exceptions, see note 90 and Part V *infra*.

**45.** 42 U.S.C. § 2000e–5(k) (1982) (emphasis added). This section was made applicable to the United States in cases such as this by the Equal Employment Opportunity Act of 1972, Pub.L. No. 92–261, § 11, 86 Stat. 111 (codified at 42 U.S.C. § 2000e–16(d) (1982)). Though on occasion we have found that asserted statutory waivers of immunity from interest liability were not "express," e.g., *Holly v. Chasen, supra* note 31; *Blake v. Califano, supra* note 32, we have not heretofore addressed the question whether the cited section effects such a waiver.

**46.** Courts have broad power to allow interest in private-sector cases, e.g., *Rodgers v. United States,* 332 U.S. 371, 373–374, 68 S.Ct. 5, 7, 92 L.Ed. 3, 6–7 (1947), and have affirmed this prerogative in attorneys'-fee awards under Title VII. See *Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760, 764 & n. 6 (7th Cir.1982), *cert. denied,* 461 U.S. 956, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983); *Brown v. Gillette Co.,* 536 F.Supp. 113, 123–124 (D.Mass.1982).

that of a private party in similar circumstances. The scope-setting statutory words—"the same as a private person"—mark out the United States' liability for attorneys' fees as well as costs in the traditional sense. Our responsibility as judges is to enforce this provision according to its terms.[47]

We think Congress articulated its goal clearly enough by providing for governmental liability "the same as a private person." Conceivably, Congress might have attempted to effectuate its purpose by legislation listing each item of costs, including interest, for which the United States might be held accountable. That approach, however, could well have led to the discovery of interstices among the enumerated items, especially since the courts would have had to obey the rule requiring strict construction of waivers of sovereign immunity;[48] its adoption, consequently, would not likely have achieved the congressional objective, manifest here, that the United States be treated no differently from private parties in similar circumstances.[49] It seems to us that, despite the availability of alternative

statutory schemes waiving immunity from interest liability, there is simply no more direct and effective way to ensure complete parity between the United States and other litigants with respect to costs than to say so in so many words. That Congress did so in this section, we conclude, evinces an "express" waiver within the meaning of the interest rule.

Congress obviously understood the broad sweep of language which makes the United States just as liable as "a private person." In the Federal Torts Claims Act,[50] which later we discuss further,[51] Congress made the United States liable for certain torts "in the same manner and to the same extent as a private individual under like circumstances,"[52] but immediately curtailed the obvious import of this language by providing that the United States "shall not be liable for interest prior to judgment."[53] It is difficult to understand why Congress bothered to exclude pre-judgment interest if the imposition upon the United States of liability "to the same extent as a private individual under like circumstances" was insuffi-

**47.** Courts consistently have declined to depart from the plain meaning of statutory language absent clear indication of a contrary legislative intent, e.g., *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246, 252 (1981), and have recognized an obligation to avoid a construction of a statutory provision that obviates any term thereof, e.g., *United States v. Menasche,* 348 U.S. 528, 538–539, 75 S.Ct. 513, 520, 99 L.Ed. 615, 624 (1955).

The dissent contends that because the word "costs" historically has not included interest as an ingredient, the statutory waiver of the United States' immunity from liability for "costs" cannot reasonably, much less strictly, be construed to extend to interest. Dis.Op. at 7. We cannot subscribe to this reasoning. The Title VII section under scrutiny in terms rejects the traditional concept of costs. It repudiates the commonly-understood difference between costs and attorneys' fees, see, e.g., *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 759–761, 100 S.Ct. 2455, 2460–2461, 65 L.Ed.2d 488, 496–498 (1980); *Baez v. United States Dep't of Justice,* 221 U.S. App.D.C. 477, 480–483, 684 F.2d 999, 1002–1005 (*en banc* 1982); 10 C. Wright, A. Miller & M. Kane, *Federal Practice* § 2666 at 173–174 (2d ed. 1983), by explicitly establishing attorneys' fees as a subset of costs.

**48.** See note 43 *supra* and accompanying text.

**49.** As another example, Congress could have enacted a statute providing that "the United States shall be liable for costs, including but not limited to interest, the same as a private person," thus stating the rule of equal treatment and specifying interest as an item of possible recovery. We think it an unnecessarily stringent application of the interest rule, however, to treat the waiver here at issue not "express" with regard to the interest component of an attorneys'-fee award simply because Congress did not express itself in precisely that form. To do so would defeat the plain meaning of the relevant statutory language Congress did use, and would penalize Congress for failing to insert redundant language into an already clearly-written and easily-applied waiver of immunity.

**50.** Act of Aug. 2, 1946, ch. 753, 60 Stat. 812 (codified as amended at 28 U.S.C. §§ 2671 *et seq.* and other scattered sections of 28 U.S.C. (1982) [hereinafter cited as codified]).

**51.** See text *infra* at notes 91–97.

**52.** 42 U.S.C. § 2674 (1982).

**53.** *Id.*

cient to constitute an express waiver of liability for that interest.

That the attorneys'-fee section of Title VII does not actually use the word "interest" does not, in our view, make the waiver any less express. Notwithstanding the long history and wide variety of verbal articulations of the interest rule, we have not uncovered a single case supporting the proposition that a waiver of sovereign immunity is not express merely on that account.[54] In fact, several decisions weigh against that position. The Supreme Court has held that Congress may satisfy the requirements of an analogous rule—that the United States is not bound by its own statutes unless expressly named therein[55] —without identifying the United States in so many words.[56] Additionally, this circuit recently has held,[57] when construing a purported waiver of governmental immunity from liability for attorneys' fees under the *Alyeska* doctrine,[58] that the words "attorneys' fees" are not "magic words"[59] that Congress must use to satisfy the requirement that the waiver be "specific, if not

explicit."[60] On the basis of such close precedent, as well as common sense, we believe that "interest" is not a "magic word" the recital of which is prerequisite to a waiver of sovereign immunity respecting the interest component of an attorneys' fee award. Surely if Congress were to enact a comprehensive and unambiguous statute abrogating entirely and for all purposes the sovereign-immunity doctrine, we would not resuscitate the United States' immunity with respect to interest merely because Congress did not specifically enumerate "interest." Rather, we would construe such a provision as an express waiver of interest immunity and implement it accordingly, and in reality we do no more here.

We underscore our more general view that an insightful approach to the problem before us is undermined, if not entirely precluded, by logomachic applications of the interest rule. Courts bear this observation out by consistently avoiding a wooden or formulaic definition of express waiver when referring to the interest rule. This circuit itself has declined to fashion a rigid

---

**54.** Most of the cases invoking the interest rule to disallow interest against the United States have done so with respect to two types of statutes. Some have done so in the context of a statute not clearly or even apparently naming the United States as potentially subject to its provisions. E.g., *Holly v. Chasen, supra* note 31, 205 U.S. App.D.C. at 274, 639 F.2d at 796 (construing 28 U.S.C. § 1961 (1982)). Others have refused to find waivers in the context of gelatinous or extremely general statutory language, such as those entitling parties "any other equitable relief as the court deems appropriate," *Blake v. Califano, supra* note 32, 200 U.S.App.D.C. at 29–31, 626 F.2d at 893–895 (construing 42 U.S.C. § 2000e–5(g) (1976)), "just compensation," e.g., *United States v. Goltra, supra* note 35, 312 U.S. at 207–211, 61 S.Ct. at 490–492, 85 L.Ed. at 780–782 (construing 48 Stat. 1322 (1934)), or "the amount equitably due," *Tillson v. United States,* 100 U.S. (10 Otto) 43, 46, 25 L.Ed. 543, 544 (1879). In contrast, the statutory provision before us specifically names the United States as a potential payor and stakes out the scope of its liability distinctly.

**55.** See 3 A. Sutherland, Statutes and Statutory Construction §§ 62.01–62.04 (C. Sands 4th ed. 1974).

**56.** See *Nardone v. United States,* 302 U.S. 379, 383, 58 S.Ct. 275, 277, 82 L.Ed. 314, 317 (1937);

*United States v. California,* 297 U.S. 175, 186–187, 56 S.Ct. 421, 425, 80 L.Ed. 567, 574 (1936).

**57.** *Kennedy v. Whitehurst,* 223 U.S.App.D.C. 228, 690 F.2d 951 (1982).

**58.** See *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

**59.** *Kennedy v. Whitehurst, supra* note 57, 223 U.S.App.D.C. at 229, 690 F.2d at 962, citing *Fitzgerald v. United States Civil Serv. Comm'n,* 180 U.S.App.D.C. 327, 330 & n. 8, 554 F.2d 1186, 1189 & n. 8 (1977). Accord *Smith v. Califano,* 446 F.Supp. 530, 533 (D.D.C.1978).

**60.** *Kennedy v. Whitehurst, supra* note 57, 223 U.S.App.D.C. at 240, 690 F.2d at 963. The standard by which language assertedly waiving governmental immunity from liability for interest will be judged as express or not has been described as "specific[ ]," e.g., *United States v. Goltra, supra* note 35, 312 U.S. at 207, 61 S.Ct. at 490, 85 L.Ed. at 780, and "explicit," e.g., *Fitzgerald v. Staats,* 188 U.S.App.D.C. 193, 198, 578 F.2d 435, 440, *cert. denied,* 439 U.S. 1004, 99 S.Ct. 616, 58 L.Ed.2d 680 (1978). The similar if not identical standard utilized in *Kennedy* renders it directly on point.

concept of express waiver,[61] and the courts have not perceived a need to establish any particular verbal formulation thereof. Rather, they have variously required, if anything at all,[62] an "express"[63] waiver, a "clearcut"[64] waiver, a "specific"[65] waiver, and "explicit"[66] waiver, an "unequivocal"[67] waiver, a "plain"[68] waiver, a "manifest"[69] waiver, an "affirmative"[70] waiver, an "unambiguous"[71] waiver, or a waiver described by a combination of these adjectives. There is nothing talismanic in the word "express,"[72] and we would distort the interest rule were we to inform its application by resort to any intuitive call for clarity of legislative expression thought peculiarily to lurk in the recesses of the word, or any other term used analogously as an ostensible criterion by which claimed waivers are to be judged. Rather, our use of the interest rule is instructed more appropriately by reference to the touchstone of the sovereign-immunity doctrine: "that

the liability of the United States ... is a matter of federal law, and its extent and the procedures for imposing it must be sought in the statutes."[73] The Supreme Court has echoed this view, declaring that the standard for gauging asserted waivers of sovereign immunity as express or not is whether the statute "can fairly be interpreted" as mandating governmental liability.[74] Giving this counsel the respect it is due, we think a disclaimer of waiver here would impart to the concept of express waiver an understanding more limited and formalistic than necessary to achieve the objectives underlying the interest rule.

This conclusion is reinforced by the resolve of several courts, recognizing the need for perspective when applying the rule requiring strict construction of sovereign-immunity waivers, to vigorously resist the tendency of the rule to become increasingly demanding by force of its own inertia.[75] As one court has put it, the strict-

---

**61.** *Blake v. Califano, supra* note 32, 200 U.S.App. D.C. at 30, 626 F.2d at 894.

**62.** On occasion, courts have not specified any particular standard by which statutory waivers of immunity will be regarded as express or not. E.g., *National Home for Disabled Volunteer Soldiers v. Parrish,* 229 U.S. 494, 496, 33 S.Ct. 944, 945, 57 L.Ed. 1296, 1299 (1913); *United States v. Maryland,* 121 U.S.App.D.C. 258, 259, 349 F.2d 693, 694 (1965).

**63.** E.g., *United States v. Alcea Band of Tillamooks, supra* note 35, 341 U.S. at 49, 71 S.Ct. at 552, 95 L.Ed. at 739.

**64.** E.g., *United States v. Thayer-West Point Hotel Co., supra* note 34, 329 U.S. at 590, 67 S.Ct. at 400, 91 L.Ed. at 526.

**65.** E.g., *Albrecht v. United States,* 329 U.S. 599, 605, 67 S.Ct. 606, 609, 91 L.Ed. 532, 539 (1947).

**66.** E.g., *United States v. North Carolina,* 136 U.S. 211, 219, 10 S.Ct. 920, 923, 34 L.Ed. 336, 339 (1890).

**67.** E.g., *Fitzgerald v. Staats, supra* note 60, 188 U.S.App.D.C. at 196, 578 F.2d at 438, quoting *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 954, 47 L.Ed.2d 114, 121 (1976).

**68.** E.g., *Blake v. Califano, supra* note 32, 200 U.S.App.D.C. at 29, 626 F.2d at 893.

**69.** E.g., *United States v. North Carolina, supra* note 66, 136 U.S. at 216, 221, 10 S.Ct. at 922, 924, 34 L.Ed. at 338, 340.

**70.** E.g., *United States v. New York Rayon Importing Co.,* 329 U.S. 654, 659, 67 S.Ct. 601, 604, 91 L.Ed. 577, 582 (1947).

**71.** E.g., *United States v. Thayer-West Point Hotel Co., supra* note 34, 329 U.S. at 590, 67 S.Ct. at 400, 91 L.Ed. at 526.

**72.** Cf. *Towne v. Eisner,* 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372, 376 (1918) ("[a] word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used").

**73.** 1 J. Moore, J. Lucas, H. Fink, D. Weckstein & J. Wicker, Moore's Federal Practice ¶ 0.65[2.–1] at 700.88 (2d ed. 1984) (footnote omitted).

**74.** *United States v. Testan, supra* note 67, 424 U.S. at 400, 96 S.Ct. at 954, 47 L.Ed.2d at 122, quoting *Eastport S.S. Corp. v. United States,* 372 F.2d 1002, 1009 (Ct.Cl.1967). See also *Cohen v. United States,* 195 F.2d 1019, 1021 (2d Cir.1952) (despite rule of strict construction, "the overriding consideration is that the intent of Congress, where that can be determined, must be given effect").

**75.** "It is a rule, firmly established beyond debate, that any purported grant by a sovereign is to be strictly construed ...; yet it must be construed, not emasculated. There is wisdom in the rule that in examining a grant by the

construction rule "is not entitled to be made a judicial vise to squeeze the natural and obvious import out of ... a statute or to sap its language of its normal and sound legal meaning."[76] The Supreme Court has reiterated the essence of this view:

> The exemption of the sovereign from suit involves hardship enough where consent has been withheld. We are not to add to its rigor by refinement of construction where consent has been announced.[77]

When dealing with the interest rule, we see as much need for perspective to avoid strangulation of legislative intent by an unwarranted use of judicial force.[78] We think Congress spoke clearly enough when, with respect to attorneys' fees, it ordained for the United States a liability "the same as a private person."[79] We hold that Congress thereby waived the immunity of the United States from liability for interest as part of a reasonable attorneys' fee.

## V

Even were we to find Title VII's attorneys'-fee section inadequate as an express

waiver, we would affirm the District Court's fee award on the basis of a substantial body of caselaw relaxing the traditional rigor of the sovereign-immunity doctrine when a statute measures the liability of the United States by that of private persons. The doctrine espoused by these cases, while spanning numerous and diverse statutory schemes, has attained prominence in litigation under the Suits in Admiralty Act.[80] It is, accordingly, with this legislation that we commence our examination of the doctrine for purposes of ascertaining its applicability to the case at bar.

As originally framed, the Act provided that the United States could be held liable for harm inflicted by its merchant vessels "[i]n cases where if such vessel were privately owned or operated, or if such cargo were privately owned or possessed, a proceeding in admiralty could be maintained."[81] Congress later amended the Act by adding, as a third clause, the phrase "or if a private person or property were involved,"[82] thus underscoring the Act's plain command that governmental liability

---

sovereign, if the words can without distortion be understood broadly or narrowly, they are to be taken in the more limited sense; but it would be an abuse of this rule to search for subtleties in an effort to defeat a grant, however phrased, when its meaning is self evident." *United States v. Smoot Sand & Gravel Corp.*, 248 F.2d 822, 827 (4th Cir.1957) (citation omitted). Accord, *United States v. California, supra* note 56, 297 U.S. at 186–187, 56 S.Ct. at 425, 80 L.Ed. at 574 ("[l]anguage and objectives so plain are not to be thwarted by resort to a rule of construction whose purpose is but to resolve doubts, and whose application in the circumstances would be highly artificial"); *Navajo Tribe v. United States*, 586 F.2d 192, 201 (Ct.Cl.1978), *cert. denied*, 441 U.S. 944, 99 S.Ct. 2163, 60 L.Ed.2d 1046 (1979) ("[i]t has never been the rule that consents-to-suit must be given the narrowest possible scope or that legislation granting jurisdiction of actions against the sovereign must be read apart from history, legislative purpose, or the dictates of commonsense") (footnote omitted). See generally *Miller v. Robertson*, 266 U.S. 243, 248, 45 S.Ct. 73, 75, 69 L.Ed. 265, 271 (1924); *Moore v. United States*, 249 U.S. 487, 489, 39 S.Ct. 322, 323, 63 L.Ed. 721, 722 (1919); *United States v. Temple*, 105 U.S. (15 Otto) 97, 99, 26 L.Ed. 967, 968 (1882).

76. *Herren v. Farm Sec. Admin.*, 153 F.2d 76, 78 (8th Cir.1946).

77. *United States v. Aetna Cas. & Sur. Co.*, 338 U.S. 366, 383, 70 S.Ct. 207, 216, 94 L.Ed. 171, 186 (1949), quoting *Anderson v. John L. Hayes Constr. Co.*, 243 N.Y. 140, 147, 153 N.E. 28, 29–30 (1926).

78. The interest rule, like the strict-construction rule, promotes the general policy confining immunity waivers by a legislative enactment to wholly appropriate situations. See text *infra* following note 115.

79. 42 U.S.C. § 2000e–5(k) (1982), quoted in text *supra* at note 45.

80. Act of Mar. 9, 1920, ch. 95, 41 Stat. 525 (codified as amended at 46 U.S.C. §§ 741–752 (1982)).

81. Suits in Admiralty Act, § 2, 41 Stat. 525 (1920) (codified as amended at 46 U.S.C. § 742 (1982)) [hereinafter cited as codified].

82. Act of Sept. 13, 1960, Pub.L. No. 86–770, § 3, 74 Stat. 912 (codified at 46 U.S.C. § 742 (1982)).

in admiralty be equivalent to that of private persons in similar circumstances.[83] Federal courts have interpreted this language broadly to effectuate the congressional purpose evident therefrom.[84] The Supreme Court has explicitly rejected application of the customary rule of strict construction and held instead that "[t]hese liberal provisions indicate that the language used in the [Act] should have its broad and ordinary meaning and should not be interpreted in a restricted ... sense." [85]

Later decisions by other federal courts have reiterated the theme that Congress intended, and that the Act should accordingly be interpreted, to make governmental liability "coextensive" with that of private parties.[86] They have rebuffed attempts to inject "unintended" or "irrational" [87] refinements into the Act, and have construed the language "sensibly, naturally, [and] ...

literally." [88] One court has even held that the United States is liable as a private person in new causes of action imported into admiralty law subsequent to passage or amendment of the Act.[89] In short, federal courts generally have refused to wield the rule of strict construction to defeat the plain and natural meaning of the Act's command that liability of the United States be identical to that of private counterparts.[90]

Buttressing the exception to the strict-construction rule prevalent in Suits in Admiralty Act cases, federal courts also have liberally construed other similarly broad statutory waivers of sovereign immunity. For example, the Federal Torts Claims Act [91] waives the immunity of the United States in unqualified language, imposing upon it liability for certain kinds of tortious conduct "to the same extent as a private

---

**83.** Early cases read this provision as extending to all suits in admiralty in derogation of statutory limitations imposed by concomitant admiralty legislation. E.g., *Roberts v. United States*, 498 F.2d 520, 525–526 (9th Cir.), *cert. denied*, 419 U.S. 1070, 95 S.Ct. 656, 42 L.Ed.2d 665 (1974); *National Union Fire Ins. Co. v. United States*, 436 F.Supp. 1078, 1080 (M.D.Tenn.1977). Although the Supreme Court, in *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976), overturned these precedents in order to preserve the efficacy of the threatened statutes, it did so by ordinary rather than strict construction of the Act. *Id.* at 170–181, 96 S.Ct. at 1323–1329, 47 L.Ed.2d at 659–665. In no respect has the Court departed from *Nahmeh v. United States*, 267 U.S. 122, 45 S.Ct. 277, 69 L.Ed. 536 (1925), and its progeny, holding that the Act's waiver of sovereign immunity is to be liberally construed. See text *infra* at notes 84–85.

**84.** See *Grillea v. United States*, 232 F.2d 919, 921 (2d Cir.1956) ("the Suits in Admiralty Act is not to be construed with the same jealousy that ordinarily circumscribes the consent of the United States to be sued"). See also *Malgren v. United States*, 390 F.Supp. 154, 156 (W.D.Mich. 1975); *Marich v. United States*, 84 F.Supp. 829, 832 (N.D.Cal.1949). Courts have not entirely abandoned the strict-construction rule, however; they have continued to apply it with respect to conditions placed by Congress upon waivers of immunity. See, e.g., *United States v. M/V Pitcairn*, 272 F.Supp. 518, 522 (E.D.La. 1967).

**85.** *Nahmeh v. United States, supra* note 83, 267 U.S. at 126, 45 S.Ct. at 278, 69 L.Ed. at 538.

**86.** *De Bardeleben Marine Corp. v. United States*, 451 F.2d 140, 143 (5th Cir.1971). See also *Canadian Pac. (Bermuda), Ltd. v. United States*, 534 F.2d 1165, 1168 (5th Cir.1976); *De Bardeleben Marine Corp. v. United States, supra*, 451 F.2d at 145; *Gulf Oil Corp. v. Panama Canal Co.*, 407 F.2d 24, 28 (5th Cir.1969); *Maritime Overseas Corp. v. United States*, 433 F.Supp. 419, 421 (N.D.Cal.1977); *Universe Tankships, Inc. v. United States*, 388 F.Supp. 276, 285 (E.D.Pa.1974), *aff'd*, 528 F.2d 73 (3d Cir.1975).

**87.** *De Bardeleben Marine Corp. v. United States, supra* note 86, 451 F.2d at 146. See also *id.* at 145–146.

**88.** *Gulf Oil Corp. v. Panama Canal Co., supra* note 84, 407 F.2d at 28.

**89.** *Malgren v. United States, supra* note 84, 390 F.Supp. at 157.

**90.** *Boston Sand & Gravel Co. v. United States*, 278 U.S. 41, 49 S.Ct. 52, 73 L.Ed. 170 (1928), however, held that a special act of Congress providing for governmental liability in an admiralty action "as in like cases ... between private parties" did not authorize an award of pre-judgment interest, because specific legislative history indicated that Congress had not intended to allow interest under this statute. *Id.* at 47, 49 S.Ct. at 53, 73 L.Ed. at 176.

**91.** 28 U.S.C. §§ 2671 *et seq.* and other scattered sections of 28 U.S.C. (1982).

individual under like circumstances."[92] The Supreme Court has placed liability on the United States for activities which, as a practical matter, are never privately undertaken because it has felt compelled to implement the "broad and just purpose which the statute was designed to effect,"[93] namely, to treat the government as any private person would be treated. Similarly, when the question arose whether the Act allowed the United States to be sued as a third-party defendant in an action for contribution initiated by a joint tortfeasor, the Court refused to read "fine distinctions" into the Act.[94] Far from accepting a rule of strict construction, it specifically rejected an attempt to restrict the scope of the Act's broad language, which clearly put the United States on the same footing as a private party.[95] The Court quoted favorably a statement to which we earlier adverted:[96] "[t]he exemption of the sovereign from suit involves hardship enough where consent has been withheld. We are not to add to its rigor by refinement of construction where consent has been announced."[97]

This same broad construction has been brought to bear on the Public Vessels Act,[98] which provides that "[a] libel in personam in admiralty may be brought against the United States ... for damages caused by a public vessel of the United States."[99] It too has been given the interpretation borne by the plain and ordinary meaning of its language.[100] Though this provision is less explicit than those of the Suits in Admiralty and Tort Claims Acts with respect to the comparative responsibilities of the United States and private persons, the Supreme Court has interpreted it "to impose on the United States the same liability ... as is imposed by the admiralty law on the private shipowner,"[101] noting that "congressional adoption of broad statutory language authorizing suit was deliberate and is not to be thwarted by an unduly restrictive interpretation."[102] The Court has since reaffirmed this holding,[103] and federal courts generally have construed the scope of governmental liability under the Public Vessels Act in terms similar if not identical to those by which they have delineated liability under the Suits in Admiralty Act.[104] A recent Supreme Court decision interprets and reconciles these statutes without recourse to or even mention of the strict-construction rule.[105]

Another example is furnished by the recent Equal Access to Justice Act, a statute

92. 28 U.S.C. § 2674 (1982).

93. *Indian Towing Co. v. United States*, 350 U.S. 61, 68–69, 76 S.Ct. 122, 126, 100 L.Ed. 48, 55 (1955).

94. *United States v. Yellow Cab Co.*, 340 U.S. 543, 549, 71 S.Ct. 399, 404, 95 L.Ed. 523, 530 (1951).

95. *Id.*

96. See text *supra* at note 77.

97. *United States v. Yellow Cab Co., supra* note 94, 340 U.S. at 554, 71 S.Ct. at 406–407, 95 L.Ed. at 532, quoting *Anderson v. John L. Hayes Constr. Co., supra* note 77, 243 N.Y. at 147, 153 N.E. at 29–30. See also *United States v. Aetna Sur. Co., supra* note 77, 338 U.S. at 383, 70 S.Ct. at 216, 94 L.Ed. at 186, quoting *Anderson v. John L. Hayes Constr. Co., supra* note 77, 243 N.Y. at 147, 153 N.E. at 29–30.

98. Act of Mar. 23, 1925, ch. 428, 43 Stat. 1112 (codified at 46 U.S.C. §§ 781–790 (1982)).

99. *Id.* § 1 (codified at 46 U.S.C. § 781 (1982)).

100. E.g., *Ira S. Bushey & Sons v. United States*, 398 F.2d 167, 169 (2d Cir.1968); *Allen v. United States*, 338 F.2d 160, 162 (9th Cir.1964), *cert. denied*, 380 U.S. 961, 85 S.Ct. 1104, 14 L.Ed.2d 152 (1965); *Jentry v. United States*, 73 F.Supp. 899, 902 (S.D.Cal.1947).

101. *Canadian Aviator, Inc. v. United States*, 324 U.S. 215, 228, 65 S.Ct. 639, 646, 89 L.Ed. 901, 910 (1945).

102. *Id.* at 222, 65 S.Ct. at 643, 89 L.Ed. at 907.

103. *Weyerhaeuser S.S. Co. v. United States*, 372 U.S. 597, 600, 83 S.Ct. 926, 928, 10 L.Ed.2d 1, 4 (1963).

104. E.g., *Gulf Oil Corp. v. Panama Canal Co., supra* note 86, 407 F.2d at 28; *Malgren v. United States, supra* note 84, 390 F.Supp. at 156; *Weiss v. United States*, 168 F.Supp. 300, 301 (D.N.J. 1958).

105. *United States v. United Continental Tuna Corp., supra* note 83.

strikingly similar to the Title VII section here at issue in its provision that the United States shall be liable for reasonable attorneys' fees and expenses "to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award." [106] While one circuit has found that this provision does not permit the award of interest,[107] others have declared categorically that the United States' liability thereunder is the same as private-party liability,[108] and generally have interpreted the statutory language to effect its "plain, clear and common meaning." [109] In light of the extension of such similar doctrine to such a variety of statutes,[110] it cannot reasonably be disputed that the numerous decisions articulating this exception represent not scattered and aberrant caselaw, but a well-established and coherent line of precedent.[111]

■ We think our approach in this case is fully consistent with the purposes of the rule of strict construction. This rule serves as a tool to calibrate judicial interpretation of purported waivers of sovereign immunity so as to minimize the risk of erroneous imposition of governmental liability under statutes that are ambiguous in scope, or are otherwise susceptible to expansion beyond the boundaries contemplat-

**106.** Act of Oct. 21, 1980, Pub.L. No. 96–481, 94 Stat. 2325 (codified at 28 U.S.C. § 2412(b) (1982)).

**107.** See *Arvin v. United States,* 742 F.2d 1301 (11th Cir.1984).

**108.** E.g., *Papson v. United States,* No. 602–80T (Ct.Cl. Apr. 28, 1982); *WATCH v. Harris,* 535 F.Supp. 9, 14 (D.Conn.1981); *Photo Data, Inc. v. Sawyer,* 533 F.Supp. 348, 350 (D.D.C.1982).

**109.** *Photo Data, Inc. v. Sawyer, supra* note 108, 533 F.Supp. at 350. At least one circuit has noted that the Act constitutes "a significant relaxation of sovereign immunity in actions seeking attorney fees from the United States," *Commissioners v. United States,* 684 F.2d 443, 444 (7th Cir.1982), and other courts likewise have accorded the terms of the statute their ordinary and reasonable meaning, e.g., *WATCH v. Harris, supra* note 108, 535 F.Supp. at 13–14; *Berman v. Schweiker,* 531 F.Supp. 1149, 1151 (N.D.Ill. 1982), *aff'd,* 713 F.2d 1290 (7th Cir.1983).

**110.** In addition to the cases already discussed, see *The Lake Monroe,* 250 U.S. 246, 254–255, 39 S.Ct. 460, 463, 63 L.Ed. 962, 967 (1919) (holding that a statutory waiver of immunity, which provided that merchant vessels bought or leased by the Shipping Board "shall be subject to all laws, regulations, and liabilities governing merchant vessels," Shipping Board Act, § 9, ch. 451, 39 Stat. 730 (1916), rendered these vessels amenable "to the same duties and liabilities as privately owned merchant vessels").

**111.** This proposition is further buttressed by the many decisions relaxing the standard of strict construction traditional under the sovereign-immunity doctrine in cases involving federal instrumentalities statutorily authorized "to sue and be sued." The Supreme Court has sustained this departure from the doctrine at least partly in the view that the United States, when acting as an ordinary person or businessman, should be amenable to the normal incidents of litigation as a private party would be. See *Standard Oil Co. v. United States,* 267 U.S. 76, 79, 45 S.Ct. 211, 212, 69 L.Ed. 519, 521 (1925). The Court has endorsed this exception even as applied to corporations or instrumentalities not explicitly empowered to sue and be sued, see *Keifer & Keifer v. Reconstruction Fin. Corp.,* 306 U.S. 381, 389, 59 S.Ct. 516, 518, 83 L.Ed. 784, 789 (1939), and has relied upon such authorization, when it has existed, as support for its conclusion that Congress intended that the governmental entity be treated as if a private party. See *FHA v. Burr,* 309 U.S. 242, 245, 60 S.Ct. 488, 490, 84 L.Ed. 724, 728–729 (1940). As the Court has noted, "the unqualified authority to sue and be sued placed [the Government] upon an equal footing with private parties as to the usual incidents of suits in relation to the payment of costs and allowances." *Reconstruction Fin. Corp. v. J.G. Menihan Corp.,* 312 U.S. 81, 85–86, 61 S.Ct. 485, 487, 85 L.Ed. 595, 598 (1941). For these reasons, the Court has discarded the rigorous standards of the sovereign-immunity doctrine and admonished that such an authorization is to be "liberally construed." *United States v. Shaw,* 309 U.S. 495, 501, 60 S.Ct. 659, 661, 84 L.Ed. 888, 892 (1940). The proposition for which these cases stand is that a federal entity, intended by Congress to act or be treated as a private party, should be subject to all of the ordinary incidents of litigation pursuant to a broad construction of the relevant statutory waiver of immunity from suit. Especially in light of the Court's extension of governmental liability to include an award of interest, see *Standard Oil Co. v. United States, supra,* we are convinced that this line of precedent strongly supports our decision to construe the Title VII provision here at issue according to the plain and ordinary meaning of its language. See text *infra* at notes 118–120.

ed by Congress.[112] Strict construction thus ensures that any waiver of sovereign immunity will be a legislative and not a judicial act.[113] When, however, Congress proclaims that the liability of the United States shall be the same as for a comparably-situated private individual—by enacting either an explicit provision to that effect or a sweeping waiver of immunity—the strict-construction rule poses a grave threat to effectuation of congressional purpose, and hence it should not be and is not applied. In such cases, courts interpret the waiver according to the plain and ordinary meaning of its language. The strict construction rule does not authorize judges to act as "self-constituted guardian[s] of the Treasury [to] import immunity back into a statute designed to limit it." [114]

 Having determined that the doctrine we invoke constitutes a purposeful as well as an entrenched exception to the strict-construction rule, it remains only to consider whether the interest rule cedes a similar exception in cases involving statutes such as the Title VII section here under scrutiny. We conclude that it does, notwithstanding that almost all decisions articulating the doctrine have done so sole-ly at the expense of the strict-construction rule.

Apart from the absence of caselaw contradicting or disallowing application of the doctrine in interest-rule cases, the Supreme Court's decision in *Standard Oil Company v. United States* [115] adds weight to the conclusion that the principle of liberal construction applies as much to the interest rule as it does to other manifestations of sovereign immunity. There the Court held the United States liable for interest despite the absence of an express waiver therefor, and solely on the ground that by acting as a private insurer it had without more consented to be treated as a private insurer.[116] This rationale bears a close resemblance to that underpinning the exception at issue, thus counseling inclusion of the interest rule within its ambit. We recognize, too, that the interest and strict-construction rules achieve similar objectives within the realm of sovereign immunity. Each operates hand-in-glove with the general rule that the United States cannot be held monetarily liable without its consent. The interest rule ensures that the United States will incur liability for interest only at the will of Congress, while the strict-construction principle operates similarly, though

---

**112.** Cf. *United States v. California, supra* note 56, 297 U.S. at 186, 56 S.Ct. at 425, 80 L.Ed. at 574 (justifying another rule of strict construction—that the sovereign was not intended to be bound by its own statute unless named in it—as "an aid to consistent construction of statutes of the enacting sovereign when their purpose is in doubt").

**113.** See text *supra* at notes 61–74; see also *Navajo Tribe v. United States, supra* note 75, 586 F.2d at 200–201. Several courts have so framed the strict-construction requirement complementing the interest rule that only an extension of governmental liability beyond the plain and literal language of the authorizing statute is proscribed. E.g., *Price v. United States,* 174 U.S. 373, 375–376, 19 S.Ct. 765, 766, 43 L.Ed. 1011, 1013 (1899). In other cases, often involving the interest rule, disallowance of governmental liability was attributable to a reluctance to read a specific basis of liability into vague or general statutory language. E.g., *Blake v. Califano, supra* note 32, 200 U.S.App.D.C. at 30, 626 F.2d at 894. These separate lines of cases, abjuring both liberal judicial construction of unclear stat-utory provisions and judicial extension of liability beyond the plain boundaries of statutory language, are both aspects of the more general policy of containing assessments of governmental liability not already marked out by legislative action. Neither, however, mandates reversal of the order on appeal. See note 42 *supra.*

**114.** *Indian Towing Co. v. United States, supra* note 93, 350 U.S. at 69, 76 S.Ct. at 126, 100 L.Ed. at 56.

**115.** *Supra* note 111.

**116.** 267 U.S. at 79, 45 S.Ct. at 212, 69 L.Ed. at 521 ("[w]hen the United States went into the insurance business, issued policies in familiar form and provided that in case of disagreement it might be sued, it must be assumed to have accepted the ordinary incidents of suits in such business"). The Court has refused, however, to relax the interest rule in cases in which the United States, though serving as an insurer, has not acted as a private insurer. See *United States v. Worley,* 281 U.S. 339, 341–342, 50 S.Ct. 291, 292–293, 74 L.Ed. 887, 889–891 (1930).

more broadly, to curtail judicial extension of governmental liability beyond the range of likely congressional intent. Consequently, just as the strict-construction rule is obviated by statutes effecting sweeping waivers of immunity or otherwise equating governmental liability with that of private persons, so do we decline to use the interest rule in the case at bar as an instrument for insertion of unintended qualifications and refinements into an otherwise plain and unambiguous statutory mandate.

The applicability of this doctrine in interest-rule cases thus established, we must, finally, determine whether the statutory provision upon which the District Court grounded its assessment of the disputed attorneys' fee against the United States fits within the confines of the exception, and we hold that it does. When Congress declared that "the United States shall be liable for costs the same as a private person," it revealed unmistakably its intention to subject the United States to treatment no different from that accorded private parties in equivalent circumstances. Title VII's attorneys'-fee provision thus measures the waiver of immunity in terms essentially identical to those in statutes already held to be governed by the doc-

trine.[117] We conclude, as a result, that the contours of this mandate must be delineated by ordinary and reasonable, not express or strict, judicial construction. ·

Under such an interpretation, we think it manifest that the attorneys'-fee section implements the overarching congressional purpose to accord " '[a]ggrieved [federal] employees or applicants ... the full rights available in the courts as are granted to individuals in the private sector under title VII.' " [118] Since claimants in private-sector Title VII cases may garner interest as one component of an attorneys'-fee award—itself defined as a part of "costs" [119]—we cannot sanction a variant doctrine of liability for the United States. We find that the District Court did not err when it fashioned an assessment of interest against the United States.[120]

## VI

We affirm, on the alternative grounds explicated, the District Court's decision to allow a 30 percent upward adjustment in the lodestar to compensate counsel for the delay in receipt of payment for the legal services he rendered under Title VII. We

117. We need not decide whether the statutory provision at issue also falls within the exception for "sweeping" waivers of immunity.

118. *Chandler v. Roudebush*, 425 U.S. 840, 841, 96 S.Ct. 1949, 1950, 48 L.Ed.2d 416, 420 (1976) (quoting S.Rep. No. 415, 92d Cong., 1st Sess. 16 (1971)). See also H.R.Rep. No. 238, 92d Cong., 1st Sess. 23 (1971), U.S.Code Cong. & Admin. News 1972, 2137; 118 Cong.Rec. 4922 (1972) (remarks of Senator Williams); *Copeland v. Marshall, supra* note 2, 205 U.S.App.D.C. at 405, 641 F.2d at 895.

119. See note 46 *supra.*

120. Our dissenting colleague says that our holding creates a statutory anomaly by treating Title VII lawyers better than their federal-sector clients inasmuch as interest would be payable as part of attorneys'-fee awards but, under *Blake v. Califano, supra* note 32, not on backpay awards. See Dis.Op. at 6. We find this argument unpersuasive for several reasons. First, we cannot treat the interests of Title VII lawyers and clients as anything other than mutually dependent. Our holding ensures that Title VII

claimants will better be able to compete for the time and energies of more experienced counsel, *Copeland v. Marshall, supra* note 2, 205 U.S.App.D.C. at 405, 641 F.2d at 895, and thus furthers the interests of clients in the most effective representation on their claims. Second, the supposed anomaly is attributable to the interest rule itself and its diverse operation in the context of the statute, a problem which Congress apparently did not anticipate. Lastly, a different holding would create its own anomaly—that private-sector clients, whose lawyers can obtain interest adjustments to lodestar amounts, see note 46 *supra,* would receive better treatment than federal-sector clients, a result clearly at odds with the fundamental objective of the Equal Employment Opportunity Act of 1972 to establish parity between federal and private-sector employees. See *Chandler v. Roudebush, supra* note 118, 425 U.S. at 841, 96 S.Ct. at 1949, 48 L.Ed.2d at 420 (quoting S.Rep. No. 415, 92d Cong., 1st Sess. 16 (1971)). It would seem strange indeed to wield the interest rule in contravention of a natural reading of the attorneys' fee section simply to ensure that interest is defeated equally for attorneys' fees as for backpay.

modify the court's order to correct a mathematical error in its computation of the lodestar,[121] and remand solely in order that the court may confirm that Shaw's counsel is not being paid twice for the delay he experienced.[122] If, in calculating the lodestar for counsel's services, the court utilized an hourly rate which reflected a reasonable charge to clients who pay their attorneys when billed, the court's order as modified will stand, and the Library must remit to counsel $2,524.50, the portion of the court's attorneys'-fee award contested on appeal.[123] If, instead, the lodestar was based on a reasonable hourly rate for services rendered under a fee-shifting statute, that rate has already taken into account the pecuniary disadvantage resulting from the lengthy wait for payment, and the court's upward adjustment to the lodestar therefore was inappropriate since it would result in double payment for the delay in receiving his money.

*So ordered.*

GINSBURG, Circuit Judge, dissenting:

In my view, precedent constrains judicial inventiveness in this case more tightly than my colleagues acknowledge. Furthermore, I believe today's decision will confound, not assist, district court judges as they labor to fathom and follow this court's proliferating instructions regarding allowance of attorneys' fees against the United States. I therefore dissent from the majority's position on the government's liability for interest.

On September 9, 1982, when we heard oral argument on appeal, we faced, and our charge was to reconcile, two not fully consistent lines of decision. One line, long-established, forbids the award of pre- or post-judgment interest payable by the United States, absent deliberate waiver by Congress of the sovereign's immunity. *See Holly v. Chasen,* 639 F.2d 795 (D.C.Cir.), *cert. denied,* 454 U.S. 822, 102 S.Ct. 107, 70 L.Ed.2d 94 (1981); *Blake v. Califano,* 626 F.2d 891 (D.C.Cir.1980), and decisions cited therein. The other, newer line contemplates an adjustment for delay in receipt of payment when counsel fees are awarded, pursuant to statute, as part of costs. *See Copeland v. Marshall,* 641 F.2d 880, 893, 906 n. 61 (D.C.Cir.1980) (en banc); *National Association of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1328–29 (D.C.Cir.1982). The difference between interest and a delay factor can be more than semantic. Interest, as that term is commonly used, is calculated retrospectively, at the completion of the period during which it accrues. A delay factor, as *Copeland* suggests, may figure as a contingency adjustment, applied prospectively to the lodestar. Just as an attorney setting an hourly rate in a contingent fee case may factor in the risk that the cause may not prevail, so too an attorney embarking on services for which he or she anticipates payment ultimately, but not promptly, may factor in the expected delay.

When a statute provides for payment of an attorney's fee by a private sector defendant, there is no need to grapple with delay in payment as a factor distinct from interest, for private defendants are not immune from the payment of pre- or post-judgment interest.[1] When the sovereign is

---

121. See note 17 *supra.*

122. See note 28 *supra.*

123. See note 24 *supra.*

1. Private sector decisions, when they adjust for the time of payment, grant interest *or* a delay factor, but not both. Decisions in private sector cases accepting some type of multiplicative lodestar adjustment to account for delay include: *Brown v. Gillette Co.,* 536 F.Supp. 113, 123–24 (D.Mass.1982); *Black Gold, Ltd. v. Rockwool Indus.,* 529 F.Supp. 272 (D.Colo.1981); *Kennelly v. Lemoi,* 529 F.Supp. 140, 144–45 (D.R.I.1981).

None of these decisions tacked on pre-judgment interest as well. At least one private sector Title VII decision allowed computation of the lodestar using current rather than historical hourly rates and did not otherwise adjust the lodestar for delay. *Chrapliwy v. Uniroyal Inc.,* 509 F.Supp. 442, 457–58 (N.D.Ind.1981), *aff'd in part and rev'd in part on other grounds,* 670 F.2d 760, 764 (7th Cir.1982), *cert. denied,* 461 U.S. 956, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983); *cf. Virginia Academy of Clinical Psychologists v. Blue Shield,* 543 F.Supp. 126 (E.D.Va.1982) (antitrust attorneys' fees calculation; court computed lodestar using current hourly rates).

the payor, however, precedent we are not at liberty to upset demands disallowance of interest add-ons unless Congress otherwise orders.

Recently, in *Murray v. Weinberger*, 741 F.2d 1423, at 1432–1434 (D.C.Cir.1984), a panel of this court attempted to chart a course between the interest-is impermissible/delay-factor-is-permissible lines of decision. *Murray*, argued on April 13, 1984, intercepted the instant case; it appeared to provide definitive instructions on the two inquiries the district court should make in ruling upon a request for a fee award adjustment to account for delay in payment. Under *Murray*, the court must determine first whether the rate incorporated in the lodestar already takes into account an anticipated time lag between rendition of services and receipt of payment. Second, if "the reasonable hourly rate incorporated into the lodestar did not reflect an increment for the expected delay in payment," the court should next inquire "whether recalculation of the lodestar utilizing current market rates instead of historic rates, is appropriate." *Id.* at 1433. I do not find in the statute before us, 42 U.S.C. § 2000e-5(k) (1982), the conscious waiver of sovereign immunity entrenched decisional law contemplates. *See, e.g., Ruckelshaus v. Sierra Club*, 462 U.S. 680, 103 S.Ct. 3274, 3277, 77 L.Ed.2d 938 (1983), *cited in Nichols v. Pierce*, 740 F.2d 1249, 1256 nn. 38, 42 (D.C.Cir.1984) (courts must take care not to enlarge waiver of sovereign immunity beyond what language of statute *requires*); *In re: Hamilton Jordan*, 745 F.2d 1574, at 1576 (D.C.Cir. Indep.Couns. Div. Oct. 16, 1984); *Phillips v. United States*, 346 F.2d 999, 1000 (2d Cir.1965) ("spirit proper to judicial consideration" of alleged sovereign immunity waiver "is not one of generosity and broad interpretation"). I would therefore adhere to the letter of the *Murray* instructions and reject

the large, "interest is permissible," postscript the majority espouses.

Although Congress has not provided for an interest add-on, and precedent does not place me at liberty to read into the statute an instruction or waiver Congress might have included had it thought about the matter, I am also bound by the more recent decisional line—opinions permitting delay factor supplementation of an attorney's fee, even when the fee is payable by the sovereign. Our recent *Murray* opinion relieves me of the reconciliation task confronting the panel when this appeal was new. The adjustment *Murray* permits serves the "important objective" of "[e]ase of administration," *Murray*, at 1433, and promises to simplify, not complicate, the chore we commit to the district court.[2] I would not go beyond *Murray* without a direction to do so from Congress.

## I. THE NO-INTEREST RULE

Nothing in the majority's labyrinthian opinion genuinely demonstrates that Congress so much as adverted to the no-interest rule when it enacted the statute in question. For all its intricacy, the majority opinion builds on a hunch: if Congress had adverted to the matter, it would have (or should have) waived immunity. I sympathize with the policy judgment the majority advances. But I cannot agree that the legislature "plainly" resolved an immunity waiver issue never even framed in the course of its deliberations.

The delay calculation made by the district court, as the majority holds, was an interest computation. The district court applied a 10% per annum rate to the base award, determined that three years would separate the time when the fee should have been paid and its actual payment, and increased the award accordingly. This calculation resembles in all relevant respects the one our court disapproved in *Holly v. Chasen*.[3] In that case the interest rate em-

---

**2.** *See infra* pp. 1491–1493.

**3.** Nor can I distinguish *Holly* based on the conduct of the government in the two cases. *Holly* did not reach the question whether a penalty,

computed in the same manner as interest, could be imposed if the government exploited delay deliberately to whittle down an award. Like *Holly*, the case before us reveals no design to shrink a fee. The district court found the delay

ployed was 6%, and the term over which interest was to accrue was indefinite, running from the judgment date to the date of payment. But the differences in the interest rates (10% versus 6%) and in the terms to which they were applied (three years versus an open-ended period) are not sufficient grounds for typing the award here as something other than interest. In both cases, augmentation of the award involved a *retrospective* calculation that placed upon the government the cost of an actual delay. A calculation of this order, by any name, is inescapably in the nature of "interest."

Contemporary conditions and equitable considerations cast doubt on the soundness of the no-interest rule governing judgments against the United States. The majority's painstakingly embroidered opinion is comprehensible only as a labor sparked by that doubt. This circuit recently has stated, however, that the entrenched character of the no-interest rule militates against alteration by the judiciary. Our court has maintained that change, in view of the long-prevailing, rigorously-applied rule, lies within the province of Congress. *See Holly v. Chasen,* 639 F.2d at 798.

In *Blake v. Califano,* we ruled that a Title VII back pay award against the government may not be augmented by prejudgment interest. Similarly, the *Holly* court held that interest may not be added to an attorney's fee payable by the United States pursuant to the Freedom of Information Act, 5 U.S.C. § 552(a)(4)(E) (1982). Both decisions underscore that waiver of the no-interest rule "cannot be by implication or by use of ambiguous language," *Holly v. Chasen,* 639 F.2d at 797; Congress, we have emphasized, must signal the authorization advertently and with clarity. *See Blake v. Califano,* 626 F.2d at 894–95 & n. 7.[4] Invited to reconsider *Blake* and allow a Title VII plaintiff to recover pre-judgment interest on a back

pay award against the federal government, we adhered to our prior holding and stated: "When Congress amended Title VII in 1972 to bring the federal government under its provisions, Congress evinced no intention to waive sovereign immunity as to interest awards." *Segar v. Smith,* 738 F.2d 1249, at 1296 (D.C.Cir.1984).

Taken together, *Blake, Segar,* and today's decision announce that Congress distinguished sharply and consciously between attorneys for Title VII litigants against government defendants, and the litigants themselves, the actual victims of discrimination. An interest calculation can augment the attorney's fees, but not the client's recovery. The majority attributes this unusual design to Congress because it was the legislature's "overarching ... purpose" to accord aggrieved federal employees the full Title VII rights available to individuals in the private sector. Majority opinion at 1484. The right available to individuals in the private sector to claim interest on back pay awards, however, cannot be secured to federal employees in cases brought in this circuit without overruling *Blake,* and now the relevant *Segar* holding as well. The majority thus settles for second best. It leaves the litigant without interest, takes care of the lawyer only, and pretends interest for the lawyer is in full harmony with *Blake* and *Segar.*

Client and lawyer are on the same footing vis-a-vis interest on Title VII awards in private sector employment, the majority concedes. A Congress that thought about the problem at all, I believe, would have placed client and lawyer on the same footing as to interest awards in the federal sector as well. Though the majority strives mightily, it cannot convincingly explain why Congress would deliberately opt to treat awards to clients and lawyers differently by allowing lawyers, but not clients, to collect interest.

---

in resolving the back pay controversy unnecessary, but it stated that the time lapse might have been avoided by more effective representation on either side of the case. *Shaw v. Library of Congress,* No. 79–0325, slip op. at 2 (D.D.C. Nov. 4, 1981).

4. *But see* Note, *Interest in Judgments Against the Federal Government: The Need for Full Compensation,* 91 YALE L.J. 297 (1981).

1488

The statute before us authorizes "a reasonable attorney's fee" as part of costs, and provides that the United States "shall be liable for costs the same as a private person." 42 U.S.C. § 2000e–5(k) (1982). The majority holds that the United States has thereby waived not only its immunity as to *costs* (in this instance, including attorneys' fees) for which Congress made express provision, but also, *sub silentio*, its immunity as to *interest on those costs.*[5] "Costs," as treated in the majority's opinion, are thus accorded a uniquely expansive interpretation. It is established, for example, that a waiver of immunity with respect to a monetary award for discrimination in employment is not a waiver with respect to interest on that award. *Blake v. Califano.* Similarly, a waiver of immunity with respect to liability on a contract is not a waiver with respect to interest on that liability. *Eastern Service Management Co. v. United States,* 363 F.2d 729, 733 (4th Cir.1966); *Economy Plumbing & Heating Co. v. United States,* 470 F.2d 585 (Ct.Cl. 1972). And in the adjustment of mutual claims, the government is entitled to interest on amounts owed to it, but is not obligated to pay interest on amounts it owes. *United States v. North American Transportation & Trading Co.,* 253 U.S. 330, 336, 40 S.Ct. 518, 521, 64 L.Ed. 935 (1920).

Enlarging an immunity waiver with respect to "costs" to include interest on costs draws on nothing inherent in the concept of "costs." "Costs" is a term of specific and narrow content; in federal adjudication, the word "costs" has never been understood to include any interest component. *See* 28 U.S.C. § 1920 (1982); *see also* 10 C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE §§ 2666, 2670 (2d ed. 1983) (hereafter, WRIGHT & MILLER).

*Pre-judgment interest* (interest "on the claim") generally ranks as an element of damages, not as a component of "costs." *Id.* § 2664, at 159–60. Its availability depends on the substantive law (state or federal( that governs the controversy. *See General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983). *Post-judgment interest* (interest "on the judgment") is a separate entitlement governed by statute or common law, not a "cost." 10 WRIGHT & MILLER, *supra,* § 2664, at 159. I therefore fail to spy in a statute allowing "costs" and specifically qualifying an attorney's fee as part of "costs," a clear, affirmative intention by Congress to displace the traditional principle that the sovereign is immune from the payment of interest on those costs. *Cf. Parker v. Lewis,* 670 F.2d 249, 250 (D.C. Cir.1982) (Title VII attorneys' fee awards against Secretary of Transportation should be determined with expedition because Secretary, "as an officer of the government, cannot be charged with interest") (citing *Holly v. Chasen* ).

The majority maintains most insistently that in rendering the United States liable for costs (including attorneys' fees) "the same as a private person," Congress unquestionably intended to waive the sovereign's immunity with respect to interest on costs. *But see Arvin v. United States,* 742 F.2d 1301 (11th Cir.1984) (Equal Access to Justice Act provision (28 U.S.C. § 2412(b) (1982)) that United States shall be liable for the reasonable fees and expenses of attorneys "to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award" does *not* waive sovereign immunity with regard to interest on attorney fee

5. Although this case involves only pre-judgment interest, the logic of the majority opinion, riveted on the 42 U.S.C. § 2000e–5(k) words "the same as a private party," extends to post-judgment interest as well. In Title VII litigation, costs include attorneys' fees. According to 28 U.S.C. § 1920 (1982), "costs" are included in the judgment. Under 28 U.S.C. § 1961 (1982), a private defendant is liable for post-judgment interest on the amount of the "judgment." In ·

combination, these two provisions render a private defendant liable for post-judgment interest on costs. *But cf. infra* note 7. If the United States is to be treated precisely as a private defendant, as the majority here argues, it follows that the United States is now exposed to both pre-judgment and post-judgment interest on Title VII attorneys' fee awards. Curiously, the majority's extended discussion leaves the reader at sea on this issue.

awards).[6] Sparse case law is cited by the majority indicating that pre-judgment interest has been considered, on occasion, in determining the liability of private persons for attorneys' fees. *See* majority opinion note 46. The terse statutory phrase ("the

same as a private person") on which the majority dominantly relies, coupled with sporadic and laconic judicial precedent in private sector cases,[7] simply do not add up to the deliberate waiver of sovereign immunity that prior decisions emphatically require.[8] *Cf. Blake v. Califano,* 626 F.2d at

---

6. *Cf. Boudin v. Thomas,* 732 F.2d 1107, 1114–15 (2d Cir.1984) (declining to extract from words "any civil action" in 28 U.S.C. § 2412(d)(1)(A) (1982) (Equal Access to Justice Act) congressional direction for United States payment of attorneys' fees in habeas corpus proceedings, although such proceedings rank as "civil actions" for other purposes—court stated that judicial finding of a waiver of the federal sovereign's immunity required "unequivocal and explicit" manifestation of the legislature's "affirmative intention," which "mere inclusion in the statute of the words 'any civil proceeding'" did not indicate).

If the statutory waiver here is "express" and "unmistakable," as the majority opinion at 1475 bravely proclaims, it is remarkable that plaintiff-appellee, represented by able, experienced counsel, never argued that position. Instead, as the majority opinion at 1473 initially acknowledged, plaintiff-appellee attempted to distinguish between "an award of interest and the adjustment of a fee to ensure that it is reasonable when there is delay in its payment." Brief for Plaintiff-Appellee at 10. The notion that the statute waives the sovereign's immunity as to interest, in short, entered this case, and has been exploited in it, as the majority's own invention.

7. *See* cases cited *supra* note 1. In Title VII cases against private defendants the courts have no occasion to dwell on or even advert to the difference between a "delay factor" and "interest." Either can be ordered as part of a monetary award as a form of the equitable relief Title VII authorizes.

In litigation against the United States no distinction is appropriately made between interest on costs and interest on the underlying monetary award. An award of costs against the United States is included in the "judgment," 28 U.S.C. § 1920 (1982); payment of costs by the United States is addressed in 28 U.S.C. § 2412 (1982), which makes reference to 28 U.S.C. § 2517 (1982). Section 2517 refers only to "judgments" and interest thereon.

There was until recently, however, a circuit division on the question whether interest runs solely on the monetary award or on court costs included in the judgment as well. In *Independence Tube Corp. v. Copperweld Corp.,* 543 F.Supp. 706, 716 (N.D.Ill.1982), the court summarized the division of authority, and its own conclusion, as follows:

The plaintiff has requested interest on attorneys' fees and costs awarded to it. In *Capra*

[sic], *Inc. v. Ward Foods, Inc.,* 567 F.2d 1316 (5th Cir.1978), the court held that interest is not payable on attorneys' fees in antitrust cases because the Clayton Act makes attorneys' fees part of the court costs and interest is not payable on court costs, and because the treble damage award makes interest on attorneys' fees less necessary than in cases where treble damages are not awarded. 567 F.2d at 1322. *Cf., Gates v. Collier,* 616 F.2d 1268 (5th Cir.1980) (interest payable on attorneys' fees in civil rights cases). Other courts, however, albeit without discussion, have allowed payment of interest on costs and attorneys' fees in antitrust cases, *Mt. Hood Stages, Inc. v. The Greyhound Corp.,* 616 F.2d 394, 406 n. 10 (9th Cir.1980); *City of Detroit v. Grinnell Corp.,* 575 F.2d 1009, 1010 (2d Cir.1977); *Perkins v. Standard Oil Co. of California,* 487 F.2d 672 (9th Cir.1973). Furthermore, unlike the Fifth Circuit, the Seventh Circuit apparently does allow interest on costs. *See Harris v. Chicago Great Western Ry.,* 197 F.2d 829, 836 (7th Cir.1952). Therefore, even if attorneys' fees are considered part of the costs rather than part of the judgment, interest on fees is appropriate.

*Carpa, Inc. v. Ward Foods, Inc.,* cited by the *Copperweld* court for the "no interest on costs" position, has since been overruled. *Copper Liquor, Inc. v. Adolph Coors Co.,* 701 F.2d 542 (5th Cir.1983) (en banc). Either approach, however, supports my position. If costs (including attorneys' fees) are to be treated for interest purposes in the same way as the underlying monetary award, this circuit's holding in *Blake, supra,* reaffirmed in *Segar, supra,* compels us to deny prejudgment interest on attorneys' fees in Title VII cases. If costs (including attorneys' fees) are categorized separately and are subject to their own, discrete "no-interest" rule (a rule sparing even private defendants), as the now-overruled *Carpa* decision maintained, then it is of no help to appellee to argue that the statute provides for reimbursement "the same as against a private person."

8. Nor can I derive from *Standard Oil Co. v. United States,* 267 U.S. 76, 45 S.Ct. 211, 69 L.Ed. 519 (1925), featured in the majority opinion at 31, genuine support for the majority's view. There, the United States went into the business of insuring vessels against war risks, adopting the form of contract used by private underwriters, and reaping a large profit from the venture. *See United States v. Worley,* 281 U.S. 339, 342, 50

893–95 (in view of "specific entrenched immunity of the Government from prejudgment interest," court is not free to allow such interest in Title VII back pay awards to federal employees; Congress must evince specific intention to authorize waiver of "settled governmental immunity"; "mere consistency with [remedial policies of Title VII] is not enough").[9]

The majority pushes beyond legitimate judicial license in stating that the interest issue here is "hardly one of first impression," and in insinuating that one might even decide the question "on stare décisis" because of "the seemingly clear applicability of [our] precedents." *See* majority opinion at 1472–1473. *But cf. id.* at 1473 ("we have dealt with [the issue] only peripherally," it is "one we have never squarely addressed"). And see *Parker v. Lewis, supra,* p. 1473. In truth, we have never focused on the no-interest rule in this context before, because the government did not rely on or even refer to the rule in prior cases. We have indeed spoken with approval not of interest, but of adjustment for delay in receipt of payment, as I observed at the outset when I said this panel initially faced the task of reconciling "two not fully consistent lines of decision." *Supra* p. 1485. I now state why I believe the court's August 24, 1984, decision in *Murray v. Weinberger* renders it unnecessary

to do more in this case than remand with directions to follow the instructions supplied in *Murray.*

## II. DELAY IN PAYMENT INSTRUCTIONS IN

### Murray v. Weinberger

In *Copeland, Holly,* and a few cases thereafter, this court indicated that a delay factor adjustment to the lodestar may be appropriate, even in litigation involving federal government defendants. The court stated in *Copeland:*

The delay in receipt of payment for services rendered is an additional factor that may be incorporated into a contingency adjustment. The hourly rates used in the "lodestar" represent the prevailing rate for clients who typically pay their bills promptly. Court-awarded fees normally are received long after the legal services are rendered. That delay can present cash-flow problems for the attorneys. In any event, payment today for services rendered long in the past deprives the eventual recipient of the value of the use of the money in the meantime, which use, particularly in an inflationary era, is valuable. A percentage adjustment to reflect the delay in receipt of payment therefore may be appropriate.

S.Ct. 291, 293, 74 L.Ed. 887 (1930). The High Court soon clarified that *Standard Oil* was an exceptional case, turning on the commercial character of the insurance business in which the government was engaged, and is not a precedent appropriately extended outside its precise context. *United States v. Worley,* 281 U.S. at 341–44, 50 S.Ct. at 292–94.

9. Congress has several times waived the United States' immunity with respect to interest. *See, e.g.,* 28 U.S.C. § 2411 (1982) (expressly authorizing pre- and post-judgment interest payable by the United States in tax refund cases); *see also* 31 U.S.C. § 1304 (1982), *cited in Holly,* 639 F.2d at 797 as 31 U.S.C. § 724a (1976) (same statutory section before recodification). These provisions supply obvious models Congress might have followed had it considered waiving the sovereign's traditional immunity in the situation presented here.

Elsewhere Congress has reiterated the general rule that interest cannot be allowed against the United States absent *express* waiver. "Interest on a claim against the United States shall be allowed in a judgment of the United States Claims Court only under a contract or Act of Congress expressly providing for payment thereof." 28 U.S.C. § 2516 (1982). "The United States shall be liable, respecting provisions of [the Federal Tort Claims Act], in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment ...." 28 U.S.C. § 2674 (1982). While the Federal Tort Claims Act refers to state law to supply rules of decision, *see id.* § 1346(b) (law of place where act or omission occurred), it appears that Congress wished to make it unmistakably clear that the traditional federal sovereign immunity rule, not state law, governs pre-judgment interest.

641 F.2d at 893; *see also id.* at 906 n. 61.[10] Along similar lines, the court in *Holly*, after rejecting an interest award, said: "We suggest ... that the possibility of a substantial delay in the payment of a fee is a factor which counsel may wish to bring to the court's attention when submitting his application for compensation." 639 F.2d at 798. Quoting the *Copeland* language set out above, the *Murray* panel instructed the district court that delay could be taken into account in either of two ways. *Murray*, at 1432–1434. Significantly, neither way involved the interest calculation eschewed in *Holly* but approved by my colleagues in this case.

I reiterate here *Murray's* two instructions, starting with the one the *Murray* panel labeled "[f]irst." The court in *Murray* explained that if the expected wait for payment "is reflected in the lodestar figure itself, an additional enhancement for delay would not be appropriate":

> First, the court should determine whether the hourly rates incorporated into the lodestar ... contain [delay] increments.... The basic hourly rate used in the lodestar figure [in *Murray*] was the rate prevailing in Title VII litigation, where lengthy delays often attend the payment of attorney's fees.... According to the fee applicants' affidavits ..., the attorneys' hourly rates for billing concurrently ... were substantially lower than the rates they charged pursuant to awards for attorney's fees under fee-shifting statutes, where lengthy delays are typically expected.... Thus the lodestar figures may already include adjustments for delay in payment.

*Murray*, at 1432–1433 (footnote omitted).

Only when the basic hourly rate incorporated into the lodestar did not "include[ ] a component for the delay which would have been expected in the payment of fees," *id.* at 1433, does *Murray* authorize a further inquiry. With an eye on the "pressing need for simple rules in attorney's fee cases," *id.* at 1433, the *Murray* court countenanced use of "current market rates instead of historic rates" in calculating lodestars, *id.*, if that would produce a reasonable fee "without generating a windfall for the plaintiff's attorneys." *Id.* at 1433. There the matter would end under *Murray v. Weinberger*, for "where the hourly rate used in computing the lodestar is based on present hourly rates a delay factor has implicitly been recognized and no [further] adjustment for delay should be allowed." *Id.* (quoting *National Association of Concerned Veterans v. Secretary of Defense*, 675 F.2d at 1329).

### III. APPLICATION OF *MURRAY* TO THE PRESENT CASE

In calculating the fee for Shaw's attorney Shalon Ralph, the district court, for the most part, followed the formula this court specified in *Copeland*. The district court first computed a lodestar of time and rate. It found that ninety-nine hours of Ralph's effort could be attributed to issues on which Shaw succeeded. *See Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 1940–41, 76 L.Ed.2d 40 (1983) (where plaintiff achieves only partial success, fee awarded must exclude compensation for services rendered in connection with any unsuccessful claim). It then determined that an $85 hourly rate was appropriate for an attorney of Ralph's experience working on problems of employment discrimination in 1978 and 1979.[11] The district court did

---

**10.** The *Copeland* court noted that a delay factor adjustment may be unwarranted when the hourly rate used in the lodestar "is based on *present* hourly rates," as distinguished from "the lesser rates applicable to the time period in which the services were rendered." *Copeland*, 641 F.2d at 893 n. 23 (emphasis in original); *see National Ass'n of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319, 1329 (D.C.Cir.1982); *cf. Environmental Defense Fund v. EPA*, 672 F.2d 42, 60 (D.C.Cir.1982) (limiting lodestar adjustment coupling "public benefit" and "delay in receipt of [Toxic Substances Control Act attorneys' fees]" in part because lodestar was calculated on the basis of current hourly rates). *Murray* developed *Copeland's* exposition of this point.

**11.** It is significant that the court determined $85 per hour would have been an appropriate rate in 1978 and 1979 when the work was performed, rather than in late 1981 when the fee was awarded. *See supra* note 10.

not consider, however, as *Murray* now requires, whether the $85 rate prevailed for clients who paid their bills promptly or whether it "included a component for the delay which would have been expected in the payment of fees" in cases of this genre. *Murray*, at 1432; *see id.* at 1428 n. 21, 1433 n. 46 (lodestar rates of $80 to $95 per hour for 1978 to 1981 may have included a delay element where attorney billed plaintiff $50 per hour at time services were rendered); *cf.* majority opinion note 28.

Next, the district court determined that the lodestar should be reduced by 20% because the court judged the representation only 80% efficient. Correctly anticipating in this regard guidance our court just supplied in *Murray*, the district court declined to make any upward adjustment for the risk Ralph assumed by taking on a case in which part of the fee was contingent on victory.[12] *See Murray*, at 1430–1432 (upward adjustment for risk of losing on merits is unwarranted to the extent that lodestar itself comprehended allowance for contingent nature of fee payment; or fee arrangement with client substantially reduced attorney's risk of nonpayment; or risk of not prevailing was unexceptional).

Finally, the court increased the award to account for the three-year delay between the time Ralph should have been paid and the time he might finally expect payment. The court stated first that the case should have ended in 1978, upon or shortly after

execution of the administrative settlement agreement, not in late 1981, after a court proceeding that attentive counsel on both sides might have avoided. Next, the court reasoned that if Ralph had been compensated in 1978 he could have invested the money at an average yield of at least 10%. Therefore, the court announced, its judgment would reflect an upward adjustment of 30% for delay.[13] That adjustment was an impermissible award of interest. I would instruct the district court, as *Murray* does, that, *if* it finds the basic hourly rate did not include a delay component, it may consider whether the use of current market rates might produce a reasonable fee.

Augmenting the inquiries *Murray* prescribed, and limiting the prospect *Murray's* plan held for a uniform, manageable approach in the district court, the majority's opinion seemingly allows anything at all reasonable to go in the name of interest. No particular computation is instructed. Each judge has "broad latitude" to choose from a range of rates, concepts, and approaches, running from the simple to the compound, so long as the court's sizable discretion is not "abused." *See* Majority opinion note 22. *Murray's* effort to accommodate, not overturn, decisional lines, to promote "[e]ase of administration," and, most of all, to "simplify the task of the district court," *Murray*, at 1433, has been undermined by today's decision.[14]

12. A retainer assured Ralph $30 per hour "win, lose, or draw." *Shaw v. Library of Congress,* No. 79–0325, slip op. 9 (D.D.C. Nov. 4, 1981).

13. The court declared that the 20% reduction of the lodestar to reflect deficiencies in the quality of representation and the 30% increase for delay yielded a net adjustment upward of 10%. A 20% adjustment down followed by a 30% adjustment up, however, yields a net upward change of only 4% $(0.8 \times 1.3 = 1.04)$. The district court might have more closely approached, although not reached, a net upward adjustment of 10% had it contemplated *compound* interest at 10% per annum (*e.g.,* annual compounding at 10% against a base of 0.8 would equal 1.0648). My point, misperceived in the majority opinion's note 22, is a small one, and surely does not involve any attribution to the district court of a design to "penalize [ ] counsel." I do not sug-

gest that legal doctrine forbids an additive method of computing percentage change or mandates compound interest when additive computation is not employed. I discern in the district court's additive approach to percentage change—an approach wholly unexplained in the district court's opinion—nothing at all complex or subtle. I detect only an unintended "mathematical mistake," an oversight no more remarkable than the $20 multiplication error the majority discovered in the district court's very same calculation.

14. In preferring the complex to the simple in styling a solution to a case so modestly presented by the parties, and in precipitating an apparent circuit split, *see Arvin v. United States, supra* p. 1488, the court has once again shown that ours is "a profession that prides itself on not throwing chaos lightly to the winds." Traynor,

For the reasons stated, I would return this case to the district court with a direction to follow to the letter the delay in payment analysis and instructions set out in *Murray v. Weinberger*.

*Comment on Courts and Lawmaking,* in LEGAL INSTITUTIONS TODAY AND TOMORROW 48, 56 (M. Paul- sen ed. 1959).