**Christine KYLES, Plaintiff,**

v.

**SECRETARY OF AGRICULTURE, Defendant.**

**Civ. A. No. 83-3115.**

United States District Court, District of Columbia.

Feb. 15, 1985.

As Corrected March 6 and March 11, 1985.

Joel P. Bennett, P.C., Washington, D.C., for plaintiff.

Joseph E. DiGenova, U.S. Atty., Royce C. Lamberth, Deborah A. Robinson, Asst. U.S. Attys., Washington, D.C., for defendant; Gail Cummings, U.S. Dept. of Agriculture, Washington, D.C., of counsel.

## MEMORANDUM

OBERDORFER, District Judge.

This is another " 'second major litigation' "[1] in the "unnecessary volume of attorney fee disputes"[2] deriving from

the policy of the United States Attorney in this District to settle fee applications without a contest in court only when counsel accept rates not in excess of $75 per hour for partners and $60 per hour for associates.

*Commonwealth of Puerto Rico v. Heckler*, 745 F.2d 709, 714 n. 7 (D.C.Cir.1984). For reasons stated below, plaintiff's application for fees will be granted.

### I.

By a written contract entered into on September 29, 1983, plaintiff engaged Joel P. Bennett as her attorney to prosecute an employment discrimination claim that she had previously initiated against the Department of Agriculture.[3] Plaintiff contracted "to pay ... for attorney time at the rate of $110 (partner); $55 (associate) per hour, plus costs, ... on a monthly basis as legal

services are performed." *See* Contract for Legal Services ¶ 2 (attached as Exhibit 1 to Plaintiff's Motion for Attorney's Fees and Costs, filed Oct. 29, 1984).[4] The time of law clerks and paralegals was billable at $35 per hour. These rates were made effective for one year; any future increase in rates was not to exceed $15 per hour per year. This undertaking was not contingent on success. The fee was payable and the costs reimbursable, win, lose or draw.

The plaintiff and Mr. Bennett have performed their contract in a thoroughly business-like way. The legal services have borne fruit in a September 26, 1984 settlement that has produced for plaintiff a substantial amount of back pay and an increase .in her annuity. She, in turn, has regularly paid the monthly bills rendered to her for services and for costs advanced by her attorney.

Each monthly bill stated the number of hours spent on the case by any partner, law clerk or paralegal during the month, the hourly rate at which that time was charged and the total time charged for each category of service. Each cost item was substantiated by a contemporaneous voucher. The charges for services were supported by detailed diary entries that accounted for time by hours and tenths of hours. On the eve of the first anniversary of the contract, Mr. Bennett advised his client of a $5 increase in the hourly rate for the ensuing year.

On October 29, 1984, after the settlement had been consummated, plaintiff filed a motion for attorney's fees for the services

1. *Blum v. Stenson*, —— U.S. ——, 104 S.Ct. 1541, 1550 n. 19, 79 L.Ed.2d 891 (1984) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983)).

2. *National Association of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319, 1330 (D.C. Cir.1982) [hereinafter cited as *"Concerned Veterans"*].

3. Prior to September 29, 1983, plaintiff had been represented by Mr. Bennett's former law partner, Mr. Robert Deso. The change in counsel occurred just as plaintiff had concluded

pressing her claim at the administrative stage and on the eve of her filing a complaint in federal district court, which she did on October 21, 1983. Mr. Deso's fee is not at issue here: on November 5, 1984, plaintiff and defendant agreed to a partial settlement, formalized on December 3, 1984, whereby attorney's fees for the administrative stage of this case were settled, at an hourly rate of $75.

4. For other forms prepared by Mr. Bennett for use in fee applications, see Bennett, *Winning Attorneys' Fees from the U.S. Government* (Law Journal Seminars Press 1984).

of Mr. Bennett and his staff in the amount of $7,768.80, calculated at the hourly rates ($110, $55 and $35) at which Mr. Bennett had billed and the client had paid for those services. As indicated, the time charges were supported by detailed, self-explanatory diary entries and the cost items were supported by contemporaneous vouchers.[5] The plaintiff further supported the motion by appending as exhibits an October 29, 1984 declaration by Mr. Bennett (filed under penalty of perjury) and a copy of his resumé.[6] Mr. Bennett's declaration disclosed that up to that time he had handled 80 cases in the employment discrimination area, and tried over 30 employment discrimination cases in federal district courts, mostly against the federal government. He stated that he usually spends between 80 and 90 percent of his clients' billable time per month on employment discrimination and related employment matters. He listed 17 such cases filed between 1976 and 1983 in which he has collected—through settlement or judgment—fees and costs totalling $155,349.11. The declaration further stated:

My *regular* hourly rates during my representation of the plaintiff in this matter have been $110.00–$125.00 per hour for my time, $55.00–$60.00 per hour for associates and $35.00–$40.00 per hour for law clerks and paralegals. See Exhibit 6 hereto. I have learned from personal inquiry that these regular hourly rates are comparable to those of similarly situated attorneys in this city.... Since October 15, 1982, my regular hourly rate has been $110.00–$125.00 per hour and the vast majority of clients

have retained me at that rate of [sic] had their rate raised to $110.00 or higher per hour pursuant to our retainer agreement, which routinely provides for annual adjustments.

Declaration of Joel P. Bennett at 6–7 (emphasis in original).

Plaintiff also filed as an exhibit to her original motion a further declaration by Mr. Bennett concerning hourly rates that he charged from June 1, 1982 through December 30, 1983, consisting of all of his open cases as of January 3, 1984, excluding this matter. Exhibit 6. The declaration listed 36 fee arrangements: 21 of them were listed as EEO matters, of which 9 involved private employers, 2 involved the District of Columbia, and 10 involved the United States as employer. The hourly rate for partners on all but three of the employment discrimination matters was stated to be $110 per hour or more. In two of the exceptions, the rate was $100 per hour in 1982, and rose to $110 per hour in 1983. The third exception, where the rate was $92.50, was a case that had been taken over from another firm that had fixed a reduced fee to begin with.

As evidence of the market rate in the precise field of employment discrimination, plaintiff cited fee awards by other judges of this court. In one such case cited by plaintiff, for example, lawyers were awarded $75 per hour for work performed in 1977 and $85 per hour for work performed in 1978, *Bachman v. Pertschuck*, No. 76–0079 (D.D.C. March 14, 1979); $100 per hour for subsequent post-settlement work, *Bachman v. Pertschuck*, No. 76–0079 (D.D.C. Aug. 18, 1981), *aff'd without opin-*

5. For an earlier exposition of Mr. Bennett's "most reasonable and ... fully justified" billing practice in another employment discrimination case; see *Arnold v. Secretary of Commerce*, C.A. No. 81–1968, slip op. at 17 (July 28, 1983) (Burnett, Mag.) (Report, Memorandum Opinion, and Recommendation).

6. The resumé discloses that Mr. Bennett graduated from Georgetown Law School in 1972, having received an A.B. degree from Brown University, and having attended the London School of Economics. At law school he was an editor of the Georgetown Law Journal. After law school

he clerked for a federal district judge in Chicago, served for three years as a trial attorney at the Federal Trade Commission, and spent eighteen months in the office of Jacob Stein, Esq. Since October 1976, when he left Mr. Stein's office, Mr. Bennett has been practicing alone, or in a small firm, with some emphasis on employment discrimination cases. The resumé discloses that during his 13 years at the bar he has published 13 articles and one book, *see supra* note 4, and has been very active in civic and in bar activities, again with some specialization in the employment discrimination area.

*ion,* No. 81–2130 (D.C.Cir. June 15, 1982); and $135 per hour for more recent legal service, *Bachman v. Miller,* 567 F.Supp. 317, 321 (D.D.C.1983). *See also Environmental Defense Fund, Inc. v. EPA,* 672 F.2d 42 (D.C.Cir.1982) ($110 per hour); *Jordan v. United States Dept. of Justice,* 691 F.2d 514, 521 (D.C.Cir.1982) ($125 per hour); *North Slope Borough v. Andrus,* 515 F.Supp. 961 (D.D.C.1981) ($45 to $125 per hour), *rev'd on other grounds sub nom. Village of Kaktovik v. Watt,* 689 F.2d 222 (D.C.Cir.1982). Indeed, another judge of this Court has approved a magistrate's recommendation of rates of $90 per hour until May 1982, $100 per hour until June 1983, and $110 per hour thereafter for Mr. Bennett himself in an employment discrimination case against the government. The magistrate, after meticulous review, was of the opinion that these rates were "reasonable at the time and are in accord with the prevailing community rates." *Arnold v. Secretary of Commerce,* C.A. No. 81–1968, slip op. at 13 (D.D.C. July 28, 1983) (Burnett, Mag.), *approved* August 10, 1983 (Johnson, J.), *appeal dismissed,* No. 83–2143 (D.C.Cir. Jan. 6, 1984).

On November 8, 1984, ten days after plaintiff filed her fee application, defendant responded with a Motion for Enlargement of Time Within Which to Respond to Plaintiff's Motion for Attorney's Fees and Costs. Defendant claimed that it intended to conduct discovery by interrogatories, requests for production of documents and "at least one" oral deposition concerning the reasonableness of the hourly rate claimed. As explanation, defendant announced an intention to discover the prevailing market rate, counsel's billing practices, his customary billing rate in this and other cases, and the amount actually paid to counsel by other clients. The motion noted that plaintiff's application already provided "certain documents which appear to be billing records of the instant action and a declaration concerning fees awarded in certain liti-

gation," but argued that this "limited information is an insufficient basis upon which to predicate a response to plaintiff's motion." The defendant did not mention the exhibit specifying counsel's hourly rates for the 36 cases then open in his office. *See supra* at 428.

Plaintiff, on November 14, 1984, opposed defendant's motion for enlargement by charging that defendant, by seeking an "extraordinary period of 60 days to respond to a straight-forward motion ... requesting a total of only $7,768.80," was engaging in "dilatory tactics." [7] Plaintiff's Opposition to Defendant's Motion for Enlargement of Time at 1.

Plaintiff's opposition stressed that plaintiff had "modest means," had borrowed the funds to pay her attorney, and that the delay cost her interest. *Id.* at 2. The opposition emphasized, without contradiction by defendant, that plaintiff's counsel had offered to give defendant "whatever reasonable discovery he sought without resorting to formal discovery but counsel for the defendant indicating [sic] that she did not even know what she wanted yet ...." *Id.* Counsel for plaintiff represented that the data contained in Exhibit 6 "is the actual amount clients have paid." *Id.* at 3. Plaintiff argued that she had furnished more than enough information for a decision on her claim. *Id.* Plaintiff charged that the discovery sought was "excessive and merely a pretext to use the might of the Executive Branch of the United States Government to force plaintiff to compromise her claim due to the delaying tactics of defendant and his counsel." *Id.* On November 20, 1984, the Court denied defendant's motion for enlargement and directed that a response to the fee application be filed by December 3, 1984.

The December 3 response acknowledged that plaintiff had claimed that her counsel's asserted hourly rate was his "customary billing rate," which, according to *Laffey v.*

---

**7.** Letters attached to plaintiff's opposition chronicled delays suffered by plaintiff in 1982 at the administrative stage in the Department of Agriculture and in 1984 in endeavoring to get

the United States Attorney's office to complete documentation of the settlement of plaintiff's discrimination claim on the merits.

*Northwest Airlines, Inc.,* 746 F.2d 4 (D.C. Cir.1984), would "presumptively [be] his reasonable hourly rate" for purposes of determining the amount to be awarded. *Id.* at 15 n. 69. The response remarkably suggested, however, that *Laffey* was not the law of the Circuit because the time for petitioning for a writ of certiorari in that case had not yet expired. Defendant's Opposition to Plaintiff's Motion for Attorney's Fees and Costs at 2 & n. 2 [hereinafter "Defendant's Fee Opposition"]. The response took no issue with the reasonableness of the number of hours charged by counsel, and conceded that " '. . . in the normal case the Government must either accede to the applicant's requested rate or provide specific contrary evidence tending to show that a lower rate would be appropriate.' " *Id.* at 2 n. 4 (quoting *Concerned Veterans, supra,* at 1326). Nonetheless, the response again contended that plaintiff had failed to substantiate the rate sought, and seemed to argue that this case is one of those "occasions in which the applicant's showing is so weak that the Government may without more simply challenge the rate as unsubstantiated." *Concerned Veterans, supra,* at 1326; *see* Defendant's Fee Opposition at 3 n. 4. Defendant further claimed that it was not "permitted" to challenge the reasonableness of the rate sought and was unable to address the merits of plaintiff's application by providing specific contrary evidence because the Court had precluded discovery. Defendant's Fee Opposition at 3 n. 4.

To demonstrate that plaintiff's rate claim was unsubstantiated, defendant pointed to the fact that counsel did not furnish data about the rates he had been paid in contingent fee cases. *Id.* at 2–3. Moreover, defendant professed to find no evidence that rates agreed to by counsel and his retained clients were the same as those actually paid by those clients. *Id.* at 4. Finally, defendant claimed the rates were unsub-

stantiated because plaintiff failed to establish that the awards relied upon " 'were determined based on actual evidence of prevailing market rates, [that] the attorneys involved had similar qualifications, and [that] issues of comparable complexity were raised.' " *Id.* (quoting *Concerned Veterans, supra,* at 1325 n. 7).

Plaintiff's December 12, 1984 reply to this opposition made several points. To meet the defendant's professed concern that plaintiff's counsel had failed to submit data about the manner in which he charged his non-hourly rate clients, plaintiff filed a supplemental declaration by Mr. Bennett providing such data. *See* Plaintiff's Reply, Exhibit 6 at 2. The supplemental declaration also contained a statement, under penalty of perjury, asserting that the rates agreed upon with his clients were, in fact, the rates at which they paid. *See id.* at 2–3. As to defendant's remaining objection, plaintiff invited the defendant's attention to eight reported cases, the facts of which could be used to determine the comparability of counsel's qualifications and the relative difficulty of the other cases. Plaintiff's Reply at 5–6.[8] Plaintiff brushed aside defendant's unusual suggestion that, because the time for seeking certiorari in *Laffey* had not expired, that decision is not the law of this Circuit or even an appropriate guideline for a district court in the exercise of its statute-given discretion. *Id.* at 4.

In addition, plaintiff's reply reported that she had encountered significant delays in consummation of the partial settlement of fees and expenses incurred in connection with the earlier, administrative stage of plaintiff's case.[9] Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for Attorney's Fees and Costs at 2–3 [hereinafter "Plaintiff's Reply"]. Citing this and other evidence of dilatory tactics and the resulting delay in reimbursement for

8. The government was a party to several of these cases and is chargeable with knowledge of the difficulty of these other cases and the quality of its opposing counsel.

9. *See supra* note 3. This partial settlement, which had been agreed to on or about November 5, 1984, was not formalized by the United States Attorney until December 3, 1984 and, as of January 15, 1985, had still not been paid.

the fees and costs that she had borrowed money to pay, plaintiff requested a 10 percent upward adjustment in her award as contemplated by *Shaw v. Library of Congress*, 747 F.2d 1469 (D.C.Cir.1984). *Id.* at 3–4. Also, with respect to the fees still in dispute, plaintiff sought an interim payment at the $75 hourly rate at which the United States conceded, in *Commonwealth of Puerto Rico v. Heckler, supra*, that it generally settled fee claims. *Id.*[10]

Mr. Bennett's supplemental declaration further chronicled his observation of a "consistent pattern of delay" in litigated attorney's fee cases both generally and in this case specifically. Supplemental Declaration of Joel P. Bennett at 1. For example, he noted that in all three cases where he had won a litigated award of attorney's fees against the United States, there was a substantial delay in payment because the Department of Justice filed a notice of appeal within 60 days after the district court award, requested an extension of time to file briefs, and then dismissed the appeal without consummating it. *Id.* at 1–2. As to this particular case, Mr. Bennett attached to the supplemental declaration a copy of his November 21, 1984 letter to the defendant's counsel summarizing his repeated efforts to resolve this dispute speedily. The letter reminded defendant's counsel that he had advised her on November 5, 1984, to let him "know what you want[ ] [by way of discovery with respect to the hourly rate] and I would supply it, if it were reasonable, without ... formal discovery." *Id.*, Exhibit 7 at 1. The letter also recited that on November 16, 1984, Mr. Bennett reiterated this request, and reemphasized that his client had borrowed money to pay his fee. *Id.* at 2. In addition, the letter requested that defendant's counsel expedite payment on the settlement that had been negotiated for attorney's fees for the administrative stage of the case, and

further requested, once again, that she advise "informally what discovery you seek as to the hourly rate I have charged Ms. Kyles so that I can give you whatever you need that is proper." *Id.* Finally, the letter—noting that the only concern in this matter was counsel's hourly rate (since September 1983)—formally requested that the government agree to an interim payment calculated at $75 per hour, citing *Shaw v. Library of Congress, supra*, and *Parker v. Lewis*, 670 F.2d 249 (D.C.Cir. 1982). *Id.* The letter suggested that this would "leave for litigation only the differential between the maximum your office will pay and the amount actually charged Ms. Kyles for [her counsel's] time." *Id.* These suggestions, however, were apparently to no avail, and the litigation went to issue.

II.

On December 21, 1984, this Court made a finding that in this case a $75 minimum was incontestable and entered an order on the authority of *Parker v. Lewis, supra*, at 250, requiring defendant to make an interim payment of $5,448.75 calculated at $75 per hour.[11] On December 27, 1984, defendant moved for reconsideration of the interim award and an enlargement of time within which to make the payment.

In support of the motion for reconsideration, defendant reiterated the contention that since the plaintiff had failed to substantiate the hourly rate sought, "this Court lacks discretion to make an award in accordance with *Laffey* ...." Memorandum in Support of Defendant's Motion for Reconsideration at 2. Moreover, defendant contended, *Parker v. Lewis* does not contemplate that a mere district court may make an interim award. *Id.* at 4. Defendant argued that in that case, although the Court of Appeals did direct that an interim award be paid pending its further consider-

---

**10.** It is worth noting in this connection that the hourly rate for the work of Mr. Bennett's for-mer law partner on the administrative stage of the case was settled at $75.00 per hour. *See supra* note 3.

**11.** Calculation of the lodestar figure and the appropriate adjustments is "inherently imprecise [so that] ... certain estimations must be made." *Copeland v. Marshall*, 641 F.2d 880, 893 (D.C.Cir.1980) (en banc).

ation of the only portion of the award genuinely in dispute, it did so only after a district court had already made findings below. *Id.* at 4. According to defendant here, moreover, plaintiff was not entitled to any upward adjustment because of delay, because such adjustment is only authorized where there has been delay in payment to the attorney; the fact that plaintiff actually paid her attorney, defendant argued, distinguishes *Shaw. Id.* at 5. On January 15, 1985, the Court held a hearing on the motion for reconsideration of the interim award and at the conclusion of the hearing denied the motion.

In support of the motion for an extension of time for payment, defendant represented that it was "moving as expeditiously as possible to obtain a determination as to whether appellate review will be sought." Defendant's Motion for Extension of Time within which to Remit Attorney's Fees at 4. Since defendant could notice a protective appeal in any event, the Court extended the time in which defendant was required to remit the interim payment of attorney's fees to February 25, 1985.[12] On February 4, 1985, defendant moved for a further extension of time to make the interim payment until 60 days after the denial of the motion for reconsideration. The Court summarily denied that second application for an extension.

### III.

Before reaching the precise issue here it is appropriate to restate some fundamentals. Title 42 U.S.C. § 2000e–5(k) provides that in Title VII actions

the court, *in its discretion,* may allow the prevailing party ... a reasonable attorney's fee as part of the costs ....

(Emphasis added.)[13] The purpose of this and related statutes is to ensure effective access to the judicial process for persons who have claims under the civil rights laws. S.Rep. No. 1011, 94th Cong., 2d Sess. 2–6 (1976), U.S.Code Cong. & Admin. News 1976, 5908, 5909–5913 (discussing purpose behind both 42 U.S.C. § 1988 and 42 U.S.C. § 2000e–5(k)). Fee awards should be "adequate to attract competent counsel, [though] ... not produce windfalls to attorneys." *See Hensley v. Eckerhart, supra,* 103 S.Ct. at 1938 n. 4. Moreover, the Supreme Court has stated that "[a] request for attorney's fees should not result in a second major litigation." *Id.* at 1941. "Ideally," the Supreme Court has said, "litigants will settle the amount of [the] fee." *Id.* The Court re-emphasized "that the district court has discretion in determining the amount of a fee award." *Id.*

*Blum v. Stenson, supra,* 104 S.Ct. 1541, provides valuable guidance as to the level at which "reasonable" hourly rates can today be expected to be set. *Blum* confronted the Supreme Court with the problem of determining the reasonable rate payable to the New York Legal Aid Society for successful litigating service in a civil rights case. The Society rendered such services without charge and therefore had no experience from which it could prove the rate it actually charged or the rate the consumer actually paid for its service. Defendant, supported by the Solicitor General as *amicus curiae,* argued that non-profit legal aid organizations should be compensated on a cost-related rate basis, rather than a market rate basis, because the market rates for for-profit organizations include elements of cost and of profit. The Court rejected the suggestion that non-profit counsel should be compensated at a lower rate than private counsel. *Id.* at 1547. Thus, in *Blum,* the Supreme Court affirmed an award by

---

**12.** At the hearing on the motion for reconsideration, the Court reminded defendant that payment, not a request for a voucher to make payment, was due February 25, and pointed out the necessity to plan ahead to be sure the funds were available when due. The Order to be entered here will supplement, but not supercede, the December 21, 1984 Order requiring an interim payment. *See Parker v. Lewis, supra,* 670 F.2d at 250.

**13.** Title 42 U.S.C. § 2000e–16(c), (d) makes this fee provision available to federal employees pressing employment discrimination suits against the federal government, such as in this case.

the District Court for the Southern District of New York for services rendered in 1978 to 1980 at the rates of $95 an hour for an attorney who had 1½ years legal practice, $100 per hour for another attorney who also had 1½ years of legal aid practice but had also clerked for a year for a state court judge, and $105 per hour for a third lawyer who had 1½ years of legal aid practice but who had clerked for two years for a federal district judge. *Id.* at 1544 n. 4.

The Supreme Court has stated in a related context that when Congress authorized federal employees to bring employment discrimination claims against the government it intended to accord them "the full rights available in the courts as are granted to individuals in the private sector under title VII." *Chandler v. Roudebush,* 425 U.S. 840, 841, 96 S.Ct. 1949, 1950, 48 L.Ed.2d 416 (1976) (quoting S.Rep. No. 415, 92d Cong., 1st Sess. 16 (1971); *see also Shaw v. Library of Congress, supra,* at 1484.

Recent rulings of our Court of Appeals are particularly instructive. *Parker v. Lewis, supra,* for example, expressed concern "that the public policy dictating that attorney's fees be awarded not be completely undercut by routine delays in payment of fees that are properly due and owing." 670 F.2d at 250. The *Parker* Court felt "compelled to assure a quick conveyance of funds ... and an expeditious determination of any additional attorneys' fees due." *Id.*

Even more recently, in *Commonwealth of Puerto Rico v. Heckler, supra,* the Court of Appeals noted that

> it is the policy of the United States Attorney in this District to settle fee applications without a contest in court only when counsel accept rates not in excess of $75 per hour for partners and $60 per hour for associates. In view of that firm policy, adhered to despite precedents approving rates considerably in excess of the $75 and $60 figures ... [*e.g.,* $110 to $125 per hour], Puerto Rico's counsel suggested that presentation of their

agreed-upon hourly rates or other market rate documentation would not have avoided "a second major litigation."

at 714 n. 7. Appearing to endorse the comment of Puerto Rico's counsel, the Court of Appeals pointedly stated in the text of the opinion illuminated by the foregoing note:

> In this area, as in others, the conduct and attitudes of official actors may be contagious. That conduct will not be "worthy" of our great government," if it is obdurate or intransigent. Nonnegotiable postures on fee awards may waste resources for all concerned. We repeat, and underscore the special importance of government attention to, the Supreme Court's call for "conscientious effort" to resolve differences over fee awards reasonably, responsibly, and without precipitating another federal case.

at 714 (citations and footnote omitted).

The Court of Appeals issued its *Laffey* opinion on September 28, 1984; *Commonwealth of Puerto Rico v. Heckler* came down on October 16, 1984. If the defendant's conduct of this case is characteristic of the government's response to these clear statements of the law and admonitions about fee case administration, then the defendant has been, in the words of the *Puerto Rico* Court, "obdurate" and "intransigent," and has failed to make the "conscientious effort" called for by the Supreme Court and our Court of Appeals.

Reliance upon an attorney's own, customary billing rates was intended by *Laffey* to prevent the "necessity of relitigating the ground rules in each case." *Laffey, supra,* at 22. Yet in this case the defendant persists in what may fairly be described as an attempt to legislate a $75 maximum rate by litigating to the hilt a claim based on a higher rate against a citizen who, like many other successful employment discrimination claimants, is lacking the means or the credit necessary to survive such attrition.[14] *See also Commonwealth v. Puerto Rico v. Heckler, supra.*

---

14. Indeed, the government here refuses to con-

cede that even the $75 per hour minimum rate

## IV.

The defendant's conduct here, and the difficulty it has caused plaintiff and her counsel, not to mention the Court, is all the more regrettable because the *ratio decidendi* for a decision against the government has been obvious since September 28, 1984, when the Court of Appeals announced its decision in *Laffey*. The narrow substantive issue is the hourly rate at which plaintiff's counsel should be paid for his work. The *Laffey* Court reiterated the Supreme Court's "great emphasis on the need for an efficient, objective system of awarding fees" that would facilitate settlement and "enable parties and courts to avoid 'a second major litigation.'" 746 F.2d at 13. In aid of this goal, the *Laffey* Court set out to determine how, objectively, a "reasonable market rate" should be set. *Id.* at 14.

In *Laffey*, the district court had awarded a fee of $3,469,829.49 to lawyers in private practice based on hourly rates for lawyers' time ranging from $75 to $175 per hour for lawyers' work on both the merits and the fee controversy. 746 F.2d at 9 n. 24. In making this award the district court refused to restrict rates to those actually charged by counsel to their other clients, and, instead, based the rate awarded on prevailing market rates, determined from the rates charged by other attorneys in the community. On appeal, defendant contended that the reasonable hourly rate for a private, for-profit law firm should be based on the rates it actually charges in the market place. *Id.* at 11.

Noting the wide disparity in methods and results evident in fee shifting decisions with respect to hourly rates, *id.* at 12–13, the Court of Appeals in *Laffey* focused on the "rather narrow task" of determining how to set a reasonable hourly rate for a private, for-profit firm whose client has

prevailed in an employment discrimination case. *Id.* at 14. In further defining the task, the Court carefully distinguished non-profit public interest law firms and other firms that do not have "firmly established billing practices." *Id.* n. 69, *see also id.* 16 n. 74. *See, e.g., Blum v. Stenson, supra,* 104 S.Ct. 1541; *Sierra Club v. Gorsuch,* 684 F.2d 972 (D.C.Cir.1982) (per curiam), *rev'd on other grounds sub nom., Ruckelhaus v. Sierra Club,* 463 U.S. 680, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983). Rather, the *Laffey* Court drew on the observation of another Court of Appeals panel that "'the best evidence [of an appropriate rate] would be the hourly rate customarily charged by the affiant himself or by his law firm." *Laffey, supra,* at 15 n. 69 (quoting *Concerned Veterans, supra,* at 1325). *See also Murray v. Weinberger,* 741 F.2d 1423, 1428 & n. 21 (D.C.Cir.1984).

The Court of Appeals went on to spell out the "strong policy reasons [that] support tying the 'reasonable hourly rate' to the firm's own billing rates," *Laffey, supra,* at 18, i.e., ease of administration, the difficulty that confronts a court attempting to evaluate market factors other than what the public actually pays for the particular services, the necessary arbitrariness of judicial rate fixing for legal services, and enhancement of the likelihood of settlement of fee questions where the rate is predictable and easily understandable. As the *Laffey* Court concluded:

> [W]hen fixed market rates already exist, there is no good reason to tolerate the substantial costs of turning every attorneys fee case into a major ratemaking proceeding. *In almost every case, the firms' established billing rates will provide fair compensation.*

*Id.* at 24 (emphasis in original) [15].

To accomplish this determination, the *Laffey* Court directed that the fee applicant

---

that was the basis for the interim award is "uncontested." Defendant's Memorandum in Support of Motion for Reconsideration at 4; *see also id.* at 4 n. 6. Yet the government readily settled the fee award for the administrative phase of this case at $75.00 per hour. *See supra* note 3. This persistent contest of an issue con-

ceded in another phase of this very case may fairly be described as precisely the type of behavior that concerned the *Puerto Rico* Court.

**15.** The dissent in *Laffey* construed the majority opinion in that case as holding that, for private law offices such as Mr. Bennett's, "historical

"should provide evidence of the rates charged by the firm for performing similar work in private representations." *Id.* There could be, said the court, "no more 'relevant comparison.' " *Id.* Next, the fee-fixing court should "bracket" this rate "by establishing that it falls within the rates charged by other firms for similar work in the same community." *Id.* at 24–25. "So long as the firm's own rate falls within the rate brackets, it is the market rate ...." *Id.* at 25.

■ The principles of *Laffey* can readily be applied to this case. Here, the fee application, especially as supplemented, shows more than adequately that, over the years of Mr. Bennett's practice, he and his colleagues had established a regular annual billing rate and a regular billing practice. This practice is best evidenced by the exemplary contract and the thorough documentation of their charges to Ms. Kyles. The regular billing rate of $110.00 per hour during the relevant period is strongly corroborated by the declaration about the rate charged to 37 other current clients, the rates approved by other judges of this court, and particularly Magistrate Bur-

nett's detailed analysis of the fee in the *Arnold* case.[16] Moreover, the record fully confirms that other judges of this court have approved even higher rates for lawyers, none of whom could be more accomplished than is Mr. Bennett in the employment discrimination field. *See supra* at pp. 428–429 & nn. 5–6. On the basis of the information in the fee application as supplemented,[17] no trier of fact could reasonably dispute these findings. Clearly, this is one of those cases referred to in *Laffey* where "the firm['s] established billing rate will provide fair compensation." *Id.* at 24.

■ As stated, the defendant contends that *Laffey* is not the law of this Circuit because of the possibility of a petition for a writ of certiorari. Obviously, this contention is untenable. A district court applying a final decision of the Court of Appeals that is squarely on point would not be abusing its discretion in doing so, even if the Supreme Court later reversed the Court of Appeals. Moreover, the theory that there is a $75 per hour ceiling for attorney's fees in Title VII cases—such as presumptively exists, for example, under the now suspended Equal Access to Justice

billing rates are virtually determinative of the 'reasonable hourly rate' ...." *Laffey, supra,* at 31 (Wright, J., dissenting) (footnote omitted).

16. *See supra* at pp. 428–429. The probative value of parallel judicial findings has recently been emphasized in *In re Sealed Cases,* 754 F.2d 395, 400 (D.C.Cir.1985).

17. Defendant's complaint about the government's claimed inability to obtain formal discovery in this matter does not survive scrutiny. Despite plaintiff's extensive substantiation, in her original fee application, of the hourly rate sought, defendant moved—on the last day of the period for filing an opposition—for a 60-day extension of time in which to respond, assertedly to conduct formal discovery into the fee request. *See supra* at 429. The motion contained no specification of the particular objections giving rise to the asserted need for formal discovery, much less an explanation of why a full 60 days' worth of discovery was necessary. *See id.* The Court of Appeals in *Concerned Veterans* has plainly instructed that "[u]nfocused requests to initiate discovery without indicating its nature or extent serve no purpose, and

the District Court has full discretion to deny such requests." *Concerned Veterans, supra,* at 1329. Therefore, on November 20, 1984, the Court denied defendant's motion. *See supra* at 429. Only in defendant's subsequent opposition to the fee application, filed December 3, 1984, did the defendant, for the first time, identify its specific objections, asserting that the fee application failed to provide sufficient information with respect to several points. *See supra* at 430. Plaintiff, in turn, in her reply and supporting exhibits filed December 12, 1984, addressed these specific objections and provided the information requested, *see id.,* thus obviating the need for any discovery that might have been indicated with respect to these particular points. At the January 15, 1985 hearing on defendant's subsequent motion for reconsideration of the interim award, various aspects of plaintiff's fee application were discussed. No further hearing is necessary, in that "the information generated by these procedures provides an adequate factual basis," *Concerned Veterans, supra,* at 1330, for an award in accordance with the "established billing rate" guidelines set out in *Laffey.*

Act [18]—has been summarily rejected in this Circuit. *See, e.g., Minority Employees at NASA v. Frosch,* 555 F.Supp. 1, 2 (D.D.C. 1981), *aff'd* 694 F.2d 846 (D.C.Cir.1982) (per curiam).

Defendant fails to explain satisfactorily why it insisted on formal discovery in this case before attempting the informal discovery offered by plaintiff.[19] Our Court of Appeals has made plain its distaste for "the zeal of government counsel" requiring "applicants to expend substantial additional time supporting fee claims ..." and for "[u]nfocused requests to initiate discovery ...." *Concerned Veterans, supra* at 1329. *See also* Fed.R.Civ.P. 26(g).

Defendant fails to explain satisfactorily why it opposed an interim distribution at the $75 rate that it had advised the Court of Appeals was the basis for settlements generally and at which defendant had already agreed to settle the attorney's fee for services provided by plaintiff's former partner during the administrative stage of this very case. Our Court of Appeals has admonished that "the interests of justice will be served by awarding the prevailing party his fees as promptly as possible." *Concerned Veterans, supra* at 1330.

Defendant fails to explain satisfactorily why the defendant should not have been more responsive to the directions of the Supreme Court and our Court of Appeals and failed to negotiate, settle and pay this well-documented fee in November 1984.

*See Concerned Veterans, supra,* at 1330–1331. The statute authorized a "reasonable" fee. It says nothing about a $75 maximum rate. Here, the rates agreed to by plaintiff, paid by a number of Mr. Bennett's clients and specifically approved by our courts are supported by abundant "indicia of overall reasonableness." *See Puerto Rico, supra* at 714.

■ It is a fact of life that in most employment discrimination cases the client or the lawyer does not have the resources to hold out for as long as the government can protract a fee dispute. There are strong indications that, knowing this, some civil officers of the Executive Branch have drawn a line in the dust: any party or lawyer who claims more than $75 per hour will have to fight for it—through formal discovery and dilatory motions for extensions of time and for reconsideration, capped by automatic appeals, many of them abandoned when briefing time approaches. By this form of "jaw-boning," these officers may well be attempting to enact a *de facto* ceiling of $75, contrary to the statutes enacted by Congress and authoritatively interpreted by the courts.[20]

As Justice Jackson wrote so eloquently: It is very well to say that those who deal with the government should turn square corners. But there is no reason why the square corners should constitute a one-way street.

The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

---

**18.** 5 U.S.C. § 504(b)(1)(A). On October 1, 1984, the Equal Access to Justice Act expired as to actions commencing after that date. Pub.L. 96–481, Title II, § 203(c), 94 Stat. 2327 (1980). The Act was re-enacted by Congress, but did not receive a timely presidential signature.

**19.** As noted, the government suggested that the plaintiff's fee application was "so weak" that the government could, "without more, simply challenge the rate[ ] as unsubstantiated." *Concerned Veterans* at 1326. Plaintiff's application cannot be characterized as "weak"; in fact, it is difficult to imagine what more the government would need formally to seek. The government professed, for example, to need to know the hourly rate charged by Mr. Bennett in contingent fee cases. This could have been ascertained informally. Moreover, that rate would be only marginally relevant to determining the rate charged to retained clients.

**20.** Note that Fed.R.Civ.P. 11 provides that:

*Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 387–88, 68 S.Ct. 1, 4–5, 92 L.Ed. 10 (1947) (Jackson, J., dissenting). The accompanying order will require plaintiff to submit a proposed order providing for prompt payment of the fee at the hourly rates at which Mr. Bennett billed the plaintiff.

## V.

 One unfortunate consequence of the defendant's protraction of this dispute is its proliferation into a number of collateral issues, most of which are susceptible to quick solution.[21] One, however, deserves special comment. As noted, plaintiff, citing *Shaw v. Library of Congress, supra,* has sought an upward adjustment of 10 percent of the entire amount requested in her fee application (as supplemented) to compensate her for the recurrent delay in this matter, particularly since she had borrowed money at interest to pay her attorney. Defendant's opposition to any upward adjustment is without merit. This is not one of those "routine delays in payment" curable by an interim award. *See Parker v. Lewis, supra,* at 250. Rather, the delay here has some of the ominous characteristics of a "purely vindictive contest over fees." *See Concerned Veterans,*

*supra,* at 1330. Moreover, the delay caused by the tactics employed by the government here has the effect, if not the purpose, of frustrating the plan of the statute to ensure effective access to the judicial process in employment discrimination cases. *See* S.Rep. No. 1011, 94th Cong., 2d Sess. 2–6 (1976).

The upward adjustment in *Shaw* was not merely for the benefit of the lawyer, but, like the entire mechanism for fee shifting, was for the benefit of persons who have suffered discrimination and seek efficient redress in court. A plaintiff could be just as discouraged by delay in payment as could a lawyer, and just as vulnerable to coercion into disadvantageous settlement. The hope and reality of an upward adjustment for payment delay would tend to counter such discouragement and facilitate achievement of Congress' plan to make adequately paid lawyers available to redress bona fide discrimination grievances in court. Nor should a court countenance defendant's attempt to distinguish *Shaw* on the theory that there was a delay of three years there while the delay here has *so far* consumed only about two months. That distinction will be adequately reflected in

---

**21.** In a November 23, 1984 supplement to his original application, plaintiff added a $200 bill for the services of a statistical expert and corrected an arithmetical error to make $9,551.39 the adjusted claim for fees and expenses through September 1984. The supplement also signaled the necessity to augment the application to cover the fees and expenses incurred in resolving the fee dispute. The December 12, 1984 reply to defendant's opposition to the plaintiff's application identified fees and costs incurred in October 1984, plus some other bills omitted from the original application making the new total $11,072.95. Further supplements identifying fees and costs for still later months have also been submitted. In addition, plaintiff applied for reimbursement for annual leave time allegedly taken by plaintiff in order to prosecute her claim, plus a previously unreimbursed amount of $355.55 incurred by plaintiff herself throughout this litigation, both before and after September 29, 1983, the date of her engagement of Mr. Bennett as her attorney.

As suggested, the disputes that have arisen with respect to these issues may be quickly resolved. The bills for experts incurred after September 29, 1983 may be added to the reimbursable costs. Plaintiff may be compensated

for annual leave consumed by plaintiff in connection with her claim, *see Laffey, supra* at 30; *Sebastian v. Texas Department of Corrections,* 541 F.Supp. 970, 978–79 (S.D.Tex.1982); *Davis v. Bolger,* 496 F.Supp. 559, 563–68 (D.D.C.1980), as well as for direct costs incurred by plaintiff, *see Laffey, supra,* at 30, except that in this case the Stipulation of Dismissal filed on December 3, 1984, bars any claim for costs incurred or leave taken before September 29, 1983. The reimbursable leave is limited in this case, however, to that required for such activity as specific preparation for and appearance in court, for depositions, for conferences with counsel, and for review and preparation of court documents, and must be established with reasonable precision. To allow the Court to evaluate the reasonableness of the claim for leave time, plaintiff may file a declaration or affidavit in evidentiary form showing the amount of leave time taken in connection with this case following September 29, 1983, and how that amount was calculated: the declaration or affidavit should show the specific activities requiring plaintiff's absence from work and the number of days or hours attributable to each specific activity. Plaintiff may also submit a declaration or affidavit containing a schedule of costs incurred after September 29, 1983.

the relatively lesser payment required to compensate for the shorter delay.

\* \* \*

The foregoing considered, plaintiff's motion for fees and costs will be granted. To that end plaintiff should, on or before February 28, 1985, submit a proposed order for judgment, supported by a schedule of fees calculated at the rates at which Mr. Bennett billed her and expects to bill her through February 28, 1985, for services on the merits and in the fee dispute plus costs. In addition, the proposed judgment order should adjust the award upward in an amount calculated at the rate paid or incurred by plaintiff as interest to carry her loan for the funds used to pay her legal expenses, and further calculated as running from December 1, 1984 until the date on which she is reimbursed by defendant. *See also Shaw v. Library of Congress, supra,* at 1479, 1484.

### ORDER

Upon consideration of plaintiff's motion for attorney's fees and costs (as supplemented), defendant's opposition, plaintiff's reply, the arguments of counsel, and the entire record herein, and for reasons stated in an accompanying memorandum, it is this 15th day of February, 1985, hereby

DECLARED and ADJUDGED: that the reasonable rates for fees in this case are $110.00 per hour for partner time; $55.00 per hour for associate time; and $35.00 per hour for paralegal time; and it is further

DECLARED and ADJUDGED: that plaintiff is entitled to an upward adjustment of the principal amount in fees and allowable costs which she had incurred as of December 1, 1984, calculated from that date to the date of reimbursement by defendant at the rate at which plaintiff paid interest on the indebtedness that she incurred to pay her attorney's fees and costs; and it is further

ORDERED: that plaintiff shall, on or before February 28, 1985, serve and file a proposed order and final judgment implementing this order and the accompanying memorandum.